STATE FARM FIRE AND CASUALTY COMPANY, Plaintiff,

v.

Harry HACKENDORN and Helen A. Dillman, Defendants.

Superior Court of Delaware, New Castle County.

Submitted: Oct. 11, 1990.
Decided: Aug. 28, 1991.

---

Robert K. Pearce of Trzuskowski, Kipp, Kelleher & Pearce, P.A., Wilmington, for plaintiff State Farm Fire and Cas. Co.

Joseph A. Hurley of Joseph A. Hurley, P.A., Wilmington, for defendant Harry Hackendorn.

### OPINION

HERLIHY, Judge.

On August 17, 1988, defendant Harry Hackendorn [Hackendorn] entered his estranged wife's beauty salon with a shotgun. He shot and killed Mrs. Hackendorn and wounded a customer, Helen A. Dillman [Dillman]. On April 3, 1989, Hackendorn pled guilty to murder second degree. In a separate civil action, Dillman received an award of $30,000 against Hackendorn. *Dillman v. Hackendorn*, Del.Super., C.A. No. 89C–JA–155, (verdict, December 11, 1989) [*Dillman*]. Plaintiff herein, State Farm Fire and Casualty Company [State Farm] defended, with reservation, that civil action.

State Farm seeks a declaratory judgment that it is not liable to indemnify Hackendorn for Dillman's award under Hackendorn's home owners' policy. The Court held a bench trial on certain factual issues involving State Farm's action.

### FACTS

As of 1988, Mr. and Mrs. Hackendorn had been married for over thirty years. Earlier in 1988, Mrs. Hackendorn became involved with another man, resulting in Mrs. Hackendorn moving out of the family home in June or July, 1988. It is clear that Hackendorn became distraught over these events. He attempted to reconcile with his wife, including visiting her at her salon, but he also spied on her.

Hackendorn is described as becoming increasingly upset, less caring concerning his personal appearance and depressed after his wife's departure. On August 13, 1988, Hackendorn purchased a pump action shotgun with a pistol grip. He took it to his brother's home, observed his brother and nephew use it and then used it himself. Later he took the shotgun to his parents' home.

On the morning of August 17, 1988, Hackendorn went to his parents' home and retrieved the shotgun. He had consumed two alcoholic drinks, as of this time. Hackendorn testified at the bench trial that he kept the gun at his parents' home because small children were living in his home. Hackendorn's parents' home is approximately two miles from his home and his wife's salon is two to three miles from his parents' home.

Around 2:00 p.m., Hackendorn entered his wife's salon with the shotgun cradled in his arm and called out his wife's name. She was working on a customer approximately ten to twelve feet away. The customer (not Dillman) was seated in a standard salon chair. Dillman was seated in the chair next in line only a few feet away. The area where all the women were located is not long, perhaps fifteen to eighteen feet in length and ten to twelve feet wide.[1]

---

1. The record considered by the Court includes photographs taken by the State Police as part of its homicide investigation.

Mrs. Hackendorn yelled, "My God, Harry, no!". Hackendorn pointed the gun at her and discharged it. The shotgun's aim was also in the general direction of Dillman and another salon employee working on Dillman. Hackendorn apparently reached into his pocket to get more ammunition and fired again. It is unclear how long the time lapse was between the two shots. It is also unclear which shot struck Dillman, who was hit in the leg.

Hackendorn left the salon and drove to Delaware State Police Troop 2. He discarded the shotgun along the way but was able to assist the police in locating it later. Upon entering the police station, he stated to an officer there, "I'm despondent. I need help. I just shot two people over at Peddler's Village [location of the salon]." The officer to whom he made that statement testified that Hackendorn was not under the influence of alcohol. Hackendorn pled guilty to murder in the second degree.

In Dillman's personal injury action, the court granted a directed verdict in favor of Hackendorn on her claim of an intentional tort. The court also directed a verdict in favor of Dillman on the issue of negligence and wantonness. The jury awarded Dillman compensatory damages in the amount of $30,000.

At the bench trial on the coverage issue, Hackendorn and State Farm introduced testimony regarding Hackendorn's mental status. The experts agreed that Hackendorn knew right from wrong and that the alcohol and any heart medication consumed on the day of the shooting played no roll in the tragic events. Hackendorn's expert opined that Hackendorn's judgment was impaired and that rage and anger broke lose compulsively causing him to shoot Mrs. Hackendorn. State Farm's expert agreed that Hackendorn was depressed and testified that Hackendorn knew a shotgun's capabilities. State Farm's expert also testified that Hackendorn's ability to expect someone else could be injured was not impaired. This expert further stated that Hackendorn's actions prior to the shooting indicated he was "ruminating" about the decision.

State Farm's home owners' policy in effect at the time of the shooting provided:

COVERAGE L—PERSONAL LIABILITY

If a claim is made or a suit is brought against an insured for damages because of bodily injury or property damage to which this coverage applies, caused by an occurrence, we will:

 1. pay up to our limit of liability for the damages for which the insured is legally liable;

 \* \* \* \* \* \*

"occurrence", ... means an accident, including exposure to conditions, which results in:

 a. bodily injury; ...

 \* \* \* \* \* \*

1. Coverage L ... do[es] not apply to:

 a. bodily injury or property damage:

 (1) which is either expected or intended by an insured;

or

 (2) to any person or property which is the result of willful and malicious acts of an insured; ..

## CONTENTIONS

Hackendorn raises various arguments. He contends that there is an inconsistency between the definition of "occurrence" and the exclusionary language. Thus, he posits, there is an ambiguity to be interpreted against State Farm. He further argues that all of the exclusionary language is ambiguous and must be interpreted in his favor. Hackendorn contends State Farm has the burden of proving the exclusion. In addition, Hackendorn argues that he lacked sufficient mental capacity to expect or intend injury to Dillman and similarly could not perpetuate a willful and malicious act. He also contends that despite his plea and the earlier directed verdicts against him, he is free to litigate all of the issues raised in this action.

State Farm disputes the existence of any ambiguity in any of the applicable language. It claims either exclusion relieves it of coverage and that Hackendorn's murder plea binds him by collateral estoppel. It argues that he has the burden of proving his mental impairment.

## STANDARD OF REVIEW

█ As a general rule, insurance contracts are construed strongly against an insurer. *Steigler v. Insurance Co. of North America*, Del.Supr., 384 A.2d 398, 400 (1978). If the language of an insurance contract is clear and unambiguous, the Court will not destroy or twist the words to construe them. *Hallowell v. State Farm Mut. Auto. Ins. Co.*, Del.Supr., 443 A.2d 925, 926 (1982). An ambiguity exists when the contract language permits two or more reasonable interpretations. *Cheseroni v. Nationwide Mutual Insurance Co.*, Del.Super., 402 A.2d 1215, 1217 (1979), *aff'd sub nom.*, Del.Supr., 410 A.2d 1015 (1980).

█ It is the insured who has the burden of proving that a claim is covered by his insurance policy. *New Castle County v. Hartford Accident and Indemnity Co.*, 933 F.2d 1162, 1181 (3rd Cir.1991). Once the insured has met that burden, the insurer has the burden of proof that the event is excluded under the policy. *Merced Mut. Ins. Co. v. Mendez*, Cal.Ct.Ap., 213 Cal. App.3d 41, 261 Cal.Rptr. 273, 277 (1989).

## COVERAGE

The initial issue is whether Hackendorn's acts are covered by his home owners' policy. The threshold question in that issue is whether the shooting of Dillman was an occurrence. An occurrence under the policy means "an accident, including exposure to conditions, ...". It is not further defined.

The parties do not agree on a definition of accident. Compare *Hartford*, 933 F.2d at 1180–81. Further, the parties do not agree as to whose vantage point is taken, *i.e.*, Dillman's (victim) or Hackendorn's (insured). The parties have neither cited nor has the Court found a Delaware decision defining accident or determining the vantage point for coverage purposes for a home owners' policy.

In automobile insurance cases, accident is to be interpreted from the victim' vantage point rather than the insured's. *Hudson v. State Farm Mut. Auto Ins. Co.*, Del.Supr., 569 A.2d 1168, 1171 (1990). This approach derives from the strong public policy behind Delaware's no fault automobile insurance laws. *Id.* The *Hudson* court, in noting this policy, stated that such an interpretation is contrary to another public policy that an insured should not be allowed to profit from his wrongdoing. *Id.*

Lacking a Delaware decision involving a home owners' policy, it is instructive to examine how other courts have handled the issue.

> ... where the insured intended all of the acts that resulted in the victim's injury, the event may not be deemed an "accident" merely because the insured did not intend to cause injury. Conversely, an "accident" exists when any aspect in the causal series of events leading to the injury or damage was unintended by the insured and a matter of fortuity.

*Merced*, 261 Cal.Rptr. at 279.

> "Accident" is defined in *Webster's Third New International Dictionary* (unabr. ed. 1966) as "1.a: an event or condition occurring by chance or arising from unknown or remote causes ... b: lack of intention or necessity." *Black's Law Dictionary* 31 (rev. ed. 1968) states that in the context of accident insurance contracts, "[a]n accident ... is an event happening without human agency, or, if happening through such agency, an event, which under circumstances, is unusual and not expected by the person to whom it happens."

*American Home Assurance Co. v. Osbourn*, 47 Md.App. 73, 422 A.2d 8, 13 (1980).

> An "accident" within the meaning of policies of accident insurance, may be anything that begins to be that happens or that is a result which is not anticipated and is unforeseen and unexpected by the

person injured or affected thereby—that is, takes place without the insured's foresight or expectation and without design or intentional causation on his part. In other words, an accident is an undesigned contingency, a casualty, a happening by chance, something out of the usual course of things, unusual, fortuitous, not anticipated and not naturally to be expected.

*Guerdon Industries, Inc. v. Fidelity & Casualty Co. of New York*, 371 Mich. 12, 123 N.W.2d 143, 147 (1963), quoting 10 *Couch on Insurance* (2d ed.) § 41.6, at 27. This definition has been recently reaffirmed, *Allstate Ins. Co. v. Freeman*, 432 Mich. 656, 443 N.W.2d 734, 740–41 (1989).

■ These various definitions can be variously interpreted to determine whether an event is an accident by (1) taking the point of view of the injured person *and/or* (2) looking at the insured's conduct.[2] The dichotomy of this analysis is succinctly stated in another shooting case [the name has been changed to reflect this case].

> While [Dillman's] wounding may have been accidental, certainly the discharge of the rifle was not an accident.

*Allstate Ins. Co. v. Cannon*, D.C.E.D.Mich., 644 F.Supp. 31, 33 (1986).

■ When examining the events of this case, it is clear that, as to Dillman, the shooting was an accident. The viewpoint of Hackendorn regarding whether the wounding was an accident presents far more complex problems. The above definitions refer to intention and expectation which are the words of the exclusionary clause in State Farm's policy. The Court finds these various definitions of accident and their application to *coverage* to be ambiguous. An ambiguity under the coverage section must be construed against State Farm, the insurer. *Hallowell*, 443 A.2d at 926; *see also Freeman*, 443 N.W.2d at 742.

As to occurrence, therefore, under this home owners' policy, the vantage point of

the victim is to be taken. As to Dillman, this incident is a happening by chance, unusual, fortuitous and not anticipated. Consequently, the Court finds that Hackendorn has met his burden of proof that an occurrence took place within the coverage section.

The analysis does not stop there. Now that Hackendorn has met his burden, the burden shifts to State Farm to prove the exclusion. *Freeman*, 443 N.W.2d at 742; *Hartford*, 933 F.2d at 1181.

### EXCLUSION

#### A

■ Exclusionary provisions in insurance contracts where ambiguous are strictly construed against the insurer. *Callaway v. Nationwide Mutual Insurance Co.*, Del., 248 A.2d 617, 619 (1968). Where not ambiguous, the rule of strict construction is inapplicable. *Id.* As with other policy language, an ambiguity exists when policy language permits two or more reasonable interpretations. *Hallowell*, 443 A.2d at 926.

The operative exclusionary language at issue here is "bodily injury (1) which is either expected or intended by the insured; or (2) to any person ... which is the result of willful or malicious acts of an insured ...". In *Farmer in the Dell Ent. v. Farmers Mut. Ins.*, Del.Supr., 514 A.2d 1097 (1986), the court had a portion of this language before it. There the exclusion was for "bodily injury or property damage ... which is expected or intended by the insured ...". *Id.* at 1099.

The Supreme Court was not asked to address, and the opinion does not reflect, whether the Court saw a difference or perceived a difference between the words "expected" or "intended". As to the language before it, the court noted:

> Thus, it is the unintentional, but foreseeable, scope of the intentional act which controls.... Where the tortfeasor clearly lacks the intent to inflict any damage

---

2. Neither party argues that the definition of occurrence stating "including exposure to conditions" applies. Under the facts of this case, that definition is inapplicable. *See Osbourn*, 422 A.2d at 13.

or injury, and it is not foreseeable that damage will occur, the exclusion will not apply.

*Farmer in the Dell Ent.*, 514 A.2d at 1100.

Some courts have recognized that there is or is perceived to be a difference between intended conduct and expected conduct. *Northwestern National Casualty Co. v. Phalen*, 182 Mont. 448, 597 P.2d 720, 726 (1979) (interpreting the phrase to exclude coverage for injuries caused by the insured, if the resulting harm was within his expectation or intention); *Otterman v. Union Mut. Fire Ins. Co.*, 130 Vt. 636, 298 A.2d 547 (1972) (affirming a trial court finding that the insured's shooting into a dark room where a police officer was located, but whose presence was not known or could have been known, was not an intended or expected injury); *Commercial Union Ins. Co. v. Mauldin*, 62 N.C.App. 461, 303 S.E.2d 214 (1983) (affirming the finding for insurer that insured's shooting at car carrying estranged wife and boyfriend where she was intended victim, but boyfriend died, was intended conduct and also expected—"anticipated that something is probable or certain", *Id.*, 303 S.E.2d at 217).

In addition, in *Farmers Auto. Ins. Assoc. v. Medina*, 29 Ill.App.3d 224, 329 N.E.2d 430 (1975), the court recognized a distinction between intended and expected. Accord *State Farm Fire & Cas. Co. v. Shelton*, 176 Ill.App.3d 858, 126 Ill.Dec. 286, 531 N.E.2d 913 (1988). Also, a "subtle" distinction was recognized in *Poston v. United States Fidelity and Guarantee Co.*, 107 Wis.2d 215, 320 N.W.2d 9, 12 (1982). In *State Farm Fire & Casualty Co. v. Jenkins*, 147 Mich.App. 462, 382 N.W.2d 796 (1985) (placing explosives in deceased's car excluded coverage), the court said:

> We believe, where a policy excludes coverage for intended *or* expected injuries, a distinction should be drawn between the terms "intentional" and "expected". In order to avoid liability for an expected injury, it must be shown that the injury was the natural, foreseeable, expected, and anticipatory result of an intentional act.

*Id.* 382 N.W.2d at 798; *see Allstate Ins. Co. v. Maloney*, 174 Mich.App. 263, 435 N.W.2d 448, 450 (1988). The Michigan Supreme Court has endorsed these appellate court definitions and the distinction between intended and expected. *Freeman*, 443 N.W.2d at 742–43.

■ In this Court's opinion, there is a difference between intentional injury and expected injury. The words are prefaced by "either" and "or". They are not thereby happenstance. Further, the word expected is not an unusual word. It is used in everyday language. The definitions accorded to it by the courts are not in "legalese" or parlance not comprehended by lay persons.

Even if the injuries were unintended, where they were the natural, foreseeable and expected and anticipatory result of the insured's intentional act, they would fall under the "expected" exclusionary language. There is nothing ambiguous about this wording. The Supreme Court in *Farmer in the Dell Ent.* did not address the distinction between "intentional" and "expected", nor did it seek to define "expected". However, the distinction and definition noted herein were presaged by that court when it said "... it is the intentional but foreseeable, scope of the intentional act which controls". *Id.* at 1100.

The issue not present in *Farmer in the Dell Ent.* is where the intentional act is directed at one person or item of property but injury or damage results to a third party or property. However, the language noted above, coupled with its logical extension to the separate definition of "expected", would potentially govern Hackendorn's conduct.

### B

As noted earlier, *ante* at 7, the burden is upon the insurer, here State Farm, to prove that the exclusion applies. *Hartford*, 933 F.2d at 1181.

Hackendorn claims that because of his emotional and mental state, he could not

have the state of mind to commit an intentional, expected, willful or malicious act. State Farm argues that Hackendorn has the burden of proving his incapacity to commit any such act.

Necessarily, the resolution of who has that burden of proof involves the resolution of a larger issue, namely, collateral estoppel. State Farm argues that Hackendorn's plea to murder second degree establishes his state of mind as a matter of law under the collateral estoppel doctrine. State Farm claims that the plea was an admission to a reckless state of mind. Thus, it contends, Hackendorn's recklessness falls within the expected or intended exclusion.

Hackendorn disputes the applicability of the doctrine. He argues that neither his guilty plea nor the directed verdict in *Dillman* collaterally estop him from relitigating his state of mind in this case. The guilty plea does not establish by collateral estoppel Hackendorn's state of mind in this case. It is an admission against interest. *Boyd v. Hammond*, Del.Supr., 187 A.2d 413, 416 (1963). It is admissible for the trier of fact to take proper inferences. *Asmuth v. Kemper*, Del.Supr., 174 A.2d 820, 824 (1961). Accord *Safeco v. McGrath*, 42 Wash.App. 58, 708 P.2d 657 (1986). This Court is the trier of fact.

The impact of the court's directed verdicts in *Dillman* is not as clear cut as the guilty plea. Collateral estoppel applies "where a question of fact essential to the judgment is litigated and determined by a valid and final judgment, the determination is conclusive between the same parties in a subsequent case on a different cause of action." *Tyndall v. Tyndall*, Del.Supr., 238 A.2d 343, 346 (1968).

Since *Tyndall*, Delaware has dropped the requirement of mutuality of parties. It is sufficient that the party against whom it is involved was a previous party. *Columbia Casualty Co. v. Playtex FP, Inc.*, Del.Supr., 584 A.2d 1214, 1217 (1991). Hackendorn was a previous party. State Farm provided his defense. Under these guidelines, the *opportunity* to assert collateral estoppel arises. *See also E.B.R. Corp. v. PSL Air Lease Corp.*, Del.Supr.,

313 A.2d 893 (1973). However, there are additional considerations. State Farm's "participation" in *Dillman* was pursuant to its duty to defend. Its duty to defend is broader than its potential liability for indemnification. *Merrimack Mut. Fire Ins. Co. v. Brennan*, Me.Supr.Jud.Ct., 534 A.2d 353 (1987).

There is not necessarily a commonality of interests between the insurer and insured. This case typifies that lack of commonality. Further, the exact issues of coverage on exclusion were not tried in *Dillman*. For these reasons, other courts have declined to permit collateral estoppel of the civil findings. *Kelly v. Cherokee Ins. Co.*, Tenn. Supr., 574 S.W.2d 735 (1978); *Farmers Ins. Co. v. Vagnozzi*, 138 Ariz. 443, 675 P.2d 703 (1983).

This Court declines to allow the invocation of offensive collateral estoppel against Hackendorn. *See also, Chrysler Corp. v. New Castle County*, Del.Supr., 464 A.2d 75 (1983). However, this Court views the *Dillman* court's directed verdicts as probative. D.R.E. 401.

Because the *Dillman* directed verdicts do not collaterally estop Hackendorn from relitigating his state of mind, the Court returns to the issue of which party has the burden of proof on state of mind. Since the burden of proof regarding the exclusion rests on State Farm to invoke the exclusion, it is only logical that it have the burden of proving that Hackendorn had the requisite state of mind.

Hackendorn pled guilty to murder second degree, as to his estranged wife. That offense is statutorily defined as recklessly causing the death of another "under circumstances which manifest a cruel, wicked and depraved indifference to human life". 11 *Del.C.* § 635(1). The phrase "cruel, wicked and depraved indifference to human life" has been defined as follows:

A cruel, wicked and depraved indifference to human life can be found if the act of the defendant is so fraught with danger that he will be likely to cause death or serious bodily injury to another. A cruel mind is one devoid of humane feel-

ing. A wicked and depraved indifference to human life reflects a condition of mind and heart fatally bent on mischief and devoid of a sense of social duty. If the act was voluntarily and willfully done and had a direct tendency to destroy the life of another, even though it was not premeditated, and was not deliberate, if it was done without justification or adequate provocation, then it can be said that such act manifested a cruel, wicked and depraved indifference to human life.

See *Waters v. State*, Del.Supr., 443 A.2d 500, 505 (1982).

Hackendorn had been in the shop several days before the shooting. He had practiced with the shotgun and kept it away from his own home. He walked into a small business establishment with a loaded shotgun. Upon entering the store, Hackendorn had the shotgun cradled and called out his wife's name. Mrs. Hackendorn was standing a few feet away and Dillman was in the direct line of fire behind Mrs. Hackendorn. There were other customers and employees in the immediate vicinity. It was daytime and the store was well lit. He aimed the weapon, shot it, reloaded it and shot it again. When he initially described to the police what he had done, he said he had shot two people.

 To have twice discharged a shotgun in a confined space full of people was clearly a reckless act and an injury to Dillman under these circumstances can be expected. The Court is not persuaded that Hackendorn's mental status stemming from the pending divorce of his wife of over thirty years and her "cheating" was sufficient to diminish his ability to perform and appreciate his act. Further, it did not operate to impair his ability to appreciate the expected consequences of his act. *Nationwide Mut. Fire Ins. Co. v. May*, 860 F.2d 219 (6th Cir.1988).

The record in this matter does not reflect whether Hackendorn was ever charged for reckless endangering in the first degree in connection with Dillman's wounding. The elements of that offense are:

A person is guilty of reckless endangering in the second degree when he recklessly engages in conduct which creates a substantial risk of physical injury to another person.

11 *Del.C.* § 604. Recklessly is defined as:

A person acts recklessly with respect to an element of an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that the element exists or will result from his conduct. The risk must be of such a nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation. A person who creates such a risk but is unaware thereof solely by reason of voluntary intoxication also acts recklessly with respect thereto.

11 *Del.C.* § 231(c). The Supreme Court has indicated that this definition of recklessness, "connotes a different type of conduct akin to the intentional infliction of harm". *Jardel v. Hughes*, Del.Supr., 523 A.2d 518, 530 (1987).

The facts of this case would justify a conviction for reckless endangering in the first degree. That finding alone, or coupled with all of the facts in this case, would trigger the exclusionary language.

The Court finds that State Farm has met its burden of proving that Hackendorn's conduct falls within the "expected" exclusionary policy language. Where he intentionally discharged his shotgun twice, injury to Dillman could be expected. The totality of the circumstances, the guilty plea and the *Dillman* directed verdicts lead to no other conclusion. Compare *State Farm Fire & Cas. Co. v. Twyman*, Del.Super., C.A. No. 86C–DE–4, Ridgely, J., 1988 WL 146531 (November 30, 1988) (throwing glass of water at seated person who unexpectedly stood up, striking the glass causing eye injury not expected or intended).

## C

The policy also excludes coverage for injuries which result from the willful and malicious act of the insured. Unlike the expected or intended language, there is a dearth of case law interpreting this exclu-

sionary phraseology. The closest case is *Farmers Ins. Group v. Sessions*, 100 Idaho 914, 607 P.2d 422 (1980). The exclusionary language there was "bodily injury ... caused wilfully, intentionally or maliciously by or at the direction of the insured ...". *Id.*

There are differences in the policy wording here and that in *Sessions*. First, the language here is "willful *and* malicious acts". The disjunctive "or" appears in *Sessions*. Second, the injury excluded here is one that "is the result" of the insured's acts versus the *Sessions'* language "caused ... by or at the direction of the insured". The *Sessions* court equated willful to intentional. This comports with the definition of willful in *Webster's Ninth New Collegiate Dictionary*, "... done deliberately; intentional ...".

Delaware courts have defined or used willful usually in the context of willful or wanton conduct. Malice was basically removed from our lexicon in 1973 with the enactment of the Criminal Code. 58 *Del. Laws* Ch. 497. The commentary to 11 *Del.C.* § 635(1) (murder second degree) fully discusses the long-standing definition of malice. That discussion need not be repeated.

Suffice it to say, whether express or implied, malice involved a certain degree of intention. Commentary, at 187–190. Interestingly, the former definition of malice required for murder in the second degree involved an act which showed a cruel and reckless indifference to human life, done voluntarily. *State v. Winsett*, Del.Super., 205 A.2d 510, 515 (1964). The definition of murder in the second degree under the provision in effect since 1973 is not too dissimilar, *ante*, at 10. Of course, malice is no longer an element or part of the definition of the crime.

However, malice is not a new word. It is not one which, by virtue of its long-standing definition in Delaware prior to 1973, is an ambiguous word. Nor can maliciously be a word without a common understanding.

■ Willful, too, has a long-definitional history in Delaware. Willfulness involves a purposefulness or design, *Gallegher v. Davis*, Del.Super., 183 A. 620, 622 (1936), whereas wantonness involves a conscious indifference to the consequences of one's conduct, *McHugh v. Brown*, Del.Supr., 125 A.2d 583, 586 (1956). As with malice, the definition and use of willful is not new. Therefore, there is no ambiguity in this language. It is not to be construed strictly against State Farm. *Callaway*, 248 A.2d at 619.

This exclusionary language is not the same as and is narrower than "criminal acts" exclusions found in other policies. *See, e.g., Young v. Allstate Ins. Co.*, Del.Super., C.A. No. 87C–AU–84, Herlihy, J., at 6, 1990 WL 63959 (February 26, 1990) (excluding coverage for bodily injury "which may be reasonably expected to result from the ... criminal acts of an insured").

■ In order for this exclusionary language to apply, Hackendorn's acts must involve something intentional toward Dillman. The language is willful *and* malicious. Both involve a degree of intentional conduct. The Court does not find such intention. Thus, the exclusion does not apply.

### PUBLIC POLICY CONSIDERATIONS

The Court has weighed conflicting public policy considerations present in this case. Dillman was injured, not by her choice or by any action on her part, *vis-a-vis*, Hackendorn. She has been awarded $30,000 in damages. Hackendorn was insured and is now serving a life sentence. As to his wife, he pled guilty to a criminal offense. He intentionally entered a somewhat crowded small business establishment with a loaded gun. In clear view, there were one or more people, in addition to his wife, in the line of fire. Delaware recognizes that an insured shall not profit by way of indemnity from his own wrongdoing. *Hudson*, 569 A.2d at 1171.

Hackendorn's criminal conduct went beyond killing his wife. He clearly endangered one or more people by his deliberate selection and use of a deadly weapon, the

use of which in the narrow confines of the store was wrongdoing. He knew the gun to have a scatter pattern, not a single projectile path. Clearly, a home owners' policy should not be obtainable and operable for conduct such as this. The consequences of providing coverage for his conduct and reduction in inhibition of potential misconduct by allowing it outweighs the concerns for an innocent victim such as Dillman. Also, it cannot be said Hackendorn bargained with State Farm and it with him to be insured for this kind of action.

## *CONCLUSION*

For the reasons stated herein, the Court finds State Farm does not have to indemnify Hackendorn for the damages awarded to Dillman.