IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

USAA CASUALTY INSURANCE )
COMPANY, )
 )
 ) C.A. No. K18C-05-050 NEP
Plaintiff, ) In and For Kent County
 )
v. )
 )
 )
TRINITY CARR, )
 )
Defendant. )

Submitted: April 5, 2019
Decided: June 12, 2019

## MEMORANDUM OPINION AND ORDER

*Upon Plaintiff's Motion for Summary Judgment*
**DENIED**

*Upon Defendant's Cross Motion for Summary Judgment*
**GRANTED**

Jeffrey A. Young, Esquire, Young & McNelis, *Attorney for Plaintiff.*

Benjamin C. Wetzel, III, Esquire (argued) and Natalie M. Ippolito, Esquire, Wetzel & Associates, P.A., *Attorneys for Defendant.*

**Primos, J.**

On April 21, 2016, Amy Joyner Francis (hereinafter "Ms. Francis"), a student at Howard High School of Technology in Wilmington, Delaware, died tragically following an incident in a restroom at the school. Subsequently, family members of Ms. Francis sued multiple defendants, including Trinity Carr (hereinafter "Ms. Carr"), in two separate lawsuits. Ms. Carr is also the Defendant in the current action, in which Plaintiff USAA Casualty Insurance Company (hereinafter "USAA") seeks a declaratory judgment that it is not required to defend or indemnify Ms. Carr in those lawsuits. The parties have filed cross motions for summary judgment, which have been submitted to the Court for decision. For the reasons stated herein, USAA's motion will be **DENIED**, and Ms. Carr's motion will be **GRANTED**.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The record before the Court for purposes of summary judgment consists of the allegations of the two complaints filed against Ms. Carr,[1] together with the provisions of the insurance policy at issue, and a copy of certain cell phone video recordings submitted by USAA depicting both an apparent interaction between Ms. Carr and Ms. Francis the day before the alleged attack, and the alleged attack itself. While the parties to this action may disagree about the truth of the facts set forth in the underlying complaints, and while they certainly disagree about the import of the

---

[1] Under Delaware law, the duty to defend is based upon "whether the underlying complaint, read as a whole, alleges a risk within the coverage of the policy." *Brosnahan Builders, Inc. v. Harleysville Mut. Ins. Co.*, 137 F. Supp. 2d 517, 525 (D. Del. 2001).

2

policy's provisions, there is no dispute about what the complaints and the policy say. Therefore, the Court will summarize the relevant portions of those documents.

The two complaints filed against Ms. Carr contain virtually identical language. They allege that Ms. Carr, while a student at Howard High, and another student, Zion Snow (hereinafter "Ms. Snow"), assaulted Ms. Francis in a restroom at the school on April 21, 2016.[2] According to the complaints, Ms. Carr and Ms. Snow "hatched a plot to seek retribution against [Ms. Francis] through the use of verbal and physical threats and intimidation and, ultimately, brutal physical force and violence" and "conspired with each other to intentionally intimidate, threaten and physically attack" Ms. Francis. The complaints allege that, following the attack, Ms. Francis was left gasping for air on the restroom floor and died shortly afterwards of "sudden cardiac arrest caused by the physical and emotional distress of the attack." According to both complaints, "[b]ut for" Ms. Carr's and the other defendants' wrongful conduct, Ms. Francis "would not have died on April 21, 2016."

Following service of process in the two lawsuits, Ms. Carr sought coverage from USAA under her mother's homeowner's insurance policy. By its terms, that policy covers an insured[3] for claims made for "'bodily injury' or 'property damage' caused by an 'occurrence'. . . ." The policy defines "occurrence" as an "accident,

---

[2] Both Ms. Carr and Ms. Snow are now adults.
[3] USAA concedes that Ms. Carr, as a resident relative of the named insured, is a potential insured under the policy.

including continuous and repeated exposure to. . . harmful conditions" that results in "bodily injury" or "property damage." "Bodily injury" is defined as "physical injury, sickness, or disease, including required care, loss of services and death that results." Finally, the policy contains an exclusion providing that coverage under the policy

> do[es] not apply to **"bodily injury"** or **"property damage"**:
>
> a. Which is reasonably expected or intended by any **"insured"** even if the resulting **"bodily injury"** or **"property damage"**:
>
> (1) Is of a different kind, quality or degree than initially expected or intended . . . .

After completion of discovery in this declaratory judgment action, USAA moved for summary judgment. Ms. Carr filed a written response in opposition to the motion but did not file a cross motion for summary judgment. At oral argument, however, counsel for Ms. Carr agreed with counsel for USAA that there is no genuine issue of material fact and that this matter is ripe for decision as a matter of law. At that time, the Court permitted counsel for Ms. Carr to advance an oral cross motion for summary judgment.

## II. STANDARD OF REVIEW

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[4] Where, as here, the parties have filed cross motions for summary judgment and have not argued that there is any issue of material fact, the Court "shall deem the motions to be the equivalent of a stipulation for decision on the merits based on the record submitted with the motions."[5] In such a procedural setting, the parties are conceding the absence of any material factual issues and, at the same time, are acknowledging that the factual record before the Court is sufficient to support their respective motions.[6]

If the language of an insurance policy is clear and unambiguous, "a Delaware court will not destroy or twist the words under the guise of construing them."[7] However, where there is ambiguity in the policy language, or confusion in the deliberate selection of language, the court must engage in construction of the language, and the policy language is always construed most strongly against the

---

[4] Del. Super. Ct. Civ. R. 56(c).

[5] Del. Super. Ct. Civ. R. 56(h).

[6] *Browning-Ferris, Inc. v. Rockford Enterprises, Inc.*, 642 A.2d 820, 823 (Del. Super. 1993).

[7] *Hallowell v. State Farm Mut. Auto. Ins. Co.*, 443 A.2d 925, 926 (Del. 1982) (citing *Apotas v. Allstate Ins. Co.*, 246 A.2d 923, 925 (Del. 1968), and *Novellino v. Life Ins. Co. of North America*, 216 A.2d 420, 422 (Del. 1966)).

5

insurer.[8] In addition, an insurance contract should be read in accordance with the "reasonable expectations" of the insured as far as the language permits.[9]

In considering whether an insurer has a duty to defend its insured, the court must consider the following factors:

> (a) where there exists some doubt as to whether the complaint against the insured alleges a risk insured against, that doubt should be resolved in favor of the insured;
> (b) any ambiguity in the pleadings should be resolved against the carrier;
> (c) if even one count or theory of plaintiff's complaint lies within the coverage of the policy, the duty to defend arises.[10]

The insured bears the burden of proving that a claim is covered by the policy.[11] Once the insured does so, the insurer has the burden of proving that an exclusion bars coverage.[12]

## III. DISCUSSION

In determining whether USAA is obligated to defend and indemnify Ms. Carr, the Court must answer two questions: (1) whether the underlying incident qualifies as an "occurrence" under the policy, and (2) whether the policy's "intentional tort" exclusion operates to bar coverage in this case.

---

[8] *Novellino*, 216 A.2d at 422; *Steigler v. Insurance Co. of North America*, 384 A.2d 398, 400 (Del. 1978).

[9] *Steigler*, 384 A.2d at 401.

[10] *Continental Cas. Co. v. Alexis I. duPont School Dist.*, 317 A.2d 101, 105 (Del. 1974).

[11] *State Farm Fire and Cas. Co. v. Hackendorn*, 605 A.2d 3, 7 (Del. Super. 1991) (citing *New Castle County v. Hartford Accident and Indemnity Co.*, 933 F.2d 1162, 1181 (3d Cir. 1991)).

[12] *Id.* (citing *Merced Mut. Ins. Co. v. Mendez*, 213 Cal. App.3d 41, 47 (1989)).

**A. Ms. Carr Has Carried Her Burden of Showing That the Underlying Incident is Covered Under the Policy as an "Occurrence."**

As previously noted, Ms. Carr, as the insured, bears the burden of proving that the conduct at issue is covered by the policy, while USAA bears the burden of proving that any exclusions apply. In determining whether the alleged assault is covered as an "occurrence," this Court looks to its earlier decision in *Camac v. Hall*.[13] Under the facts of *Camac*, the insured, Hall, had entered a restroom, encountered Camac, and intentionally struck him, causing injury to him. In *Camac*, as here, coverage was provided for bodily injury or property damage caused by an "occurrence," and "occurrence" was defined as bodily injury or property damage resulting either from an "accident" or from continuous and repeated exposure to a condition. Moreover, in *Camac*, as here, the term "accident" was not defined by the policy.

The *Camac* Court noted that the Court's earlier decision in *Hackendorn*, *supra*, had defined "accident" as "an event not anticipated or foreseen by the victim, or an outcome not intended by the insured."[14] The *Camac* Court concluded that the assault qualified as an "accident" because Hall had struck Camac while Camac was using the restroom, and it was "not usual or expected to be struck at such a time."[15]

---

[13] 698 A.2d 394 (Del. Super. 1996).
[14] *Camac*, 698 A.2d at 396 (citing *Hackendorn*, 605 A.2d at 7-9).
[15] *Id.*

7

The *Hackendorn* Court similarly found that the incident at issue in that case qualified as an "accident," and therefore that the insured had met his burden of demonstrating coverage.[16] In reaching this conclusion, the *Hackendorn* Court examined decisions from other jurisdictions regarding the definition of "accident" and summarized those decisions as follows: whether an event is considered an accident is determined by "(1) taking the point of view of the injured person *and/or* (2) looking at the insured's conduct."[17] Applying these principles to the facts before it, the *Hackendorn* Court concluded that as to the victim, Dillman, the shooting was clearly an accident, but as to the insured, Hackendorn, whether the incident was an accident was much more complicated, given the concepts of intention and expectation discussed in the decisional law examined by the court.[18] The *Hackendorn* Court therefore found applications of the various definitions of accident to the questions of coverage in the case before it to be ambiguous, and because ambiguity is to be construed against the insurer, whether the incident was to be considered an accident was to be viewed from the perspective of the victim, Dillman.[19]

There is similar ambiguity in this case with regard to whether the incident in

---

[16] Under the facts of *Hackendorn*, the insured had fired a shotgun twice in a confined space (a small beauty salon), killing his wife (the intended target) but also injuring the victim, Dillman.

[17] 605 A.2d at 8 (emphasis in original).

[18] *Id.* This was presumably because, although Hackendorn had not *intended* to wound Dillman, he had *intentionally* discharged the shotgun and should have *expected* that she would be injured.

[19] *Id.*

the restroom at Howard High qualifies as an accident. It is clear from the record before this Court that, from the perspective of Ms. Francis, the attack in the restroom at Howard High was an accident—that it was a "happening by chance, unusual, fortuitous and not anticipated."[20] Although the complaints in the underlying lawsuits allege that Ms. Carr and Ms. Snow had "confronted and threatened" Ms. Francis the day before the attack, there is no indication in the complaints that Ms. Francis entered the restroom on April 21 expecting to be physically assaulted.[21] The perspective of Ms. Carr, on the other hand, like that of Mr. Hackendorn, is more complicated. While there can be no dispute that Ms. Carr intended to harm Ms. Francis, there is no indication, as will be more fully discussed later in this opinion, that Ms. Carr either intended to cause Ms. Francis's death or expected that her death would result from her (Ms. Carr's) actions. Therefore, the ambiguity must be construed against USAA, and the incident must be viewed from Ms. Francis's perspective—*i.e.*, as an accident.

Clearly one aspect of the ambiguity present in both *Camac* and *Hackendorn*—and also present here—is that none of the insurance policies involved clarify whether the term "accident" is to be analyzed from the perspective of the victim or that of the insured. In both *Camac* and *Hackendorn*, the Court concluded

---

[20] *Id.*

[21] The Court notes, as well, the absence of any indication in the cell phone video recordings of the incidents of April 20 and 21 that Ms. Francis anticipated or expected the physical attack.

that the ambiguity present should be resolved against the insurer by viewing the event from the perspective of the victim. The Court must reach a similar conclusion here, and must determine that Ms. Carr has carried her burden of showing that the incident in question constitutes an "occurrence" under the policy.

In arguing that the alleged attack does not qualify as an "occurrence," USAA points to the decision in *TIG Insurance Company v. Premier Parks, Inc.*,[22] where this Court stated that "[b]y their very nature, intentional torts are not 'accidents'" for purposes of a policy definition of "occurrence."[23] The *TIG* Court, however, was applying Oklahoma law, not Delaware law.[24] Therefore, its pronouncements do not apply in this case.[25]

---

[22] 2004 WL 728858 (Del. Super. Mar. 10, 2004).

[23] *Id.* at *11.

[24] *Id.* at *4.

[25] *But cf. McAlley v. Selective Ins. Co. of America*, 2011 WL 601662, at *3 (Del. Super. Feb. 16, 2011) (Court found that alleged sexual abuse of minor by insured did not constitute an "accident," and therefore did not qualify as an "occurrence" under the policy). *McAlley* is distinguishable, both because it involved sexual abuse of the alleged victim, and because the insured had conceded that the counts of the complaint alleging intentional or reckless conduct did not invoke coverage, but claimed that the single count of the complaint alleging negligent conduct triggered a duty to defend. *Id.* The Court ultimately determined that the complaint's characterization of intentional sexual abuse as negligent conduct did not operate to trigger coverage, where there were no facts to support such a characterization. *Id.* To the extent, however, that *McAlley* stands for the proposition that **any** incident involving intentional conduct on the part of the insured cannot qualify as an "accident," and therefore as an "occurrence," under similar policy language, this Court declines to follow it, given that there is no acknowledgement or analysis in *McAlley* of the ambiguities inherent in the undefined term "accident," as there was in *Hackendorn* and *Camac*.

10

**B. USAA Has Failed to Carry Its Burden of Showing That the "Intentional Tort" Exclusion Applies.**

Because the underlying incident qualifies as an "occurrence," it potentially triggers coverage under the policy. Still at issue, however, is the applicability of the "intentional tort" exclusion.

**1. The Injuries That Occurred in This Case Were Not Reasonably Foreseeable.**

This Court in *Camac* and *Hackendorn*, as well as the Delaware Supreme Court in *Farmer in the Dell Enterprises, Inc. v. Farmers Mutual Insurance Co.*,[26] considered the applicability of exclusionary language that was similar—but not identical—to the language at issue in this case. All three decisions addressed policy language, like that of the policy in this case, excluding coverage for bodily injury or property damage that was "expected or intended" by the insured.

In *Farmer in the Dell*, *Camac*, and *Hackendorn*, the Courts addressed the importance of the issue of foreseeability in evaluating exclusionary language. In *Farmer in the Dell* and *Hackendorn*, those advocating for coverage argued that the respective tortfeasors had not intended the injury or damage that actually occurred (in *Farmer in the Dell*, the destruction of a building, and in *Hackendorn*, injury to a bystander). In both cases, the Courts found the intentional tort exclusion applicable because the injury/damage was "expected," *i.e.*, reasonably foreseeable, even if not

---

[26] 514 A.2d 1097 (Del. 1986).

11

"intended."[27] Similarly, the Court in *Camac* found that "the physical injuries which in fact occurred were reasonably foreseeable"—*i.e.*, "expected"—even if they were more extensive than the tortfeasor intended.[28]

As the Supreme Court explained in *Farmer in the Dell*, an exclusion for injury or damage that is "expected or intended" applies where there has been an intentional act along with an intent to cause some injury or damage "so long as it is reasonably foreseeable that the damage **which actually followed** would in fact occur."[29] The *Hackendorn* and *Camac* Courts similarly recognized that in order for the exclusion to apply, the insured/tortfeasor's conduct must have been intentional and, even if the resulting injuries were not intended, they must have been reasonably foreseeable.[30]

In its Reply Brief, USAA cites *Farmer in the Dell* for the proposition that Delaware courts have denied applicability of the intentional act exclusion only "[w]here the tortfeasor clearly lacks the intent to inflict any damage or injury. . . ."[31] That, however, is not a fair reading. Rather, in the cited passage, the *Farmer in the*

---

[27] *Farmer in the Dell*, 514 A.2d at 1099; *Hackendorn*, 605 A.2d at 9.

[28] *Camac*, 698 A.2d at 398.

[29] 514 A.2d at 1099 (emphasis supplied).

[30] *See Hackendorn*, 605 A.2d at 9 ("Even if the injuries were unintended, where they were the natural, foreseeable and expected and anticipatory result of the insured's intentional act, they would fall under the 'expected' exclusionary language."); *Camac*, 698 A.2d at 398 ("When a person clearly intends the act that causes the other person's injuries, and the resulting injuries are reasonably foreseeable, Delaware law clearly states that a court must give effect to liability coverage exclusion clauses in homeowner insurance contracts.")

[31] *Farmer in the Dell*, 514 A.2d at 1100.

*Dell* Court was merely responding to the citation of inapposite authorities involving an actor who had intended to scare or frighten the victim but had intended no damage or injury to the victim. The quoted passage must be read in the context of the entire decision, including the Supreme Court's holding, noted previously, that application of the exclusion is allowed "upon the showing of an intentional act coupled with an intent to cause some injury or damage so long as it is reasonably foreseeable that the damage which actually followed would in fact occur."[32]

Turning to the facts of this case, there is no question that Ms. Carr intended to cause some injury to Ms. Francis: the factual allegations of the underlying complaints are unequivocal about such an intent. However, there is no indication in the record that the injury that actually resulted from Ms. Carr's conduct—Ms. Francis's death—was either intended by Ms. Carr or reasonably foreseeable to her. Although the underlying complaints are silent about whether Ms. Francis suffered from a latent medical condition,[33] there is no dispute that Ms. Francis suffered from a preexisting cardiac condition that was unknown to all involved, including Ms. Carr and Ms. Francis, prior to the attack, and that this condition led to her death.[34]

---

[32] *Id.* at 1099.

[33] The complaints state merely that Ms. Francis "died of sudden cardiac arrest caused by the physical and emotional distress of the attack."

[34] USAA acknowledges in its Opening Brief that Ms. Francis died as a result of the attack "because of an unknown preexisting heart condition. . . ." Similarly, in her Response Brief, Ms. Carr states that Ms. Francis "died from cardiac arrest caused by an undiagnosed, extremely rare medical condition."

Indeed, it was the issue of foreseeability upon which Ms. Carr's appeal of her related delinquency adjudication turned. The Delaware Supreme Court reversed Ms. Carr's criminally negligent homicide adjudication because her conduct had failed to reach the standard for criminal negligence: the "actual result" of her conduct—Ms. Francis's death—was "outside the risk" of which Ms. Carr should have been aware.[35]

A review of the video recording of the attack submitted by USAA confirms that the harm that resulted from Ms. Carr's intentional conduct was not reasonably foreseeable. While the video recording is certainly disturbing, and demonstrates that Ms. Carr intended to cause harm to Ms. Francis, no review of the video recording could lead to a credible contention that Ms. Carr intended to cause Ms. Francis's death, or that she could reasonably have foreseen that her actions would result in Ms. Francis's death. Indeed, this Court concurs with the Supreme Court's assessment that the video does not show a "severely violent" attack, but rather a physical altercation during which Ms. Carr rather ineffectually struck at Ms. Francis and pulled her hair, and the two ended up on the floor pushing against each other

---

[35] 11 *Del. C.* § 263; *Cannon v. State*, 181 A.3d 615 (Del. 2018). Pursuant to Supreme Court Rule 7(d), Ms. Carr was assigned the pseudonym "Tracy Cannon" for purposes of that appeal. As USAA has not clearly stated an intent to relitigate the Supreme Court's determination that Ms. Francis's death was beyond the risk of which Ms. Carr should have been aware, this Court need not decide whether that determination would have collateral estoppel effect with regard to the issue of foreseeability. *Cf. Nationwide Mut. Ins. Co. v. Flagg*, 789 A.2d 586 (Del. Super. 2001) (defendants collaterally estopped from relitigating with homeowner's insurer the question, previously determined in criminal proceeding, of whether insured had committed intentional acts).

with their feet.[36]

To be sure, while the underlying legal principles are the same, the unusual facts of this case distinguish it from cases like *Farmer in the Dell* and *Hackendorn*—and point to a different result. In *Farmer in the Dell*, it was reasonably foreseeable that starting a fire in a trash pile and then setting the burning trash next to a restaurant building would result in destruction of the building. In *Hackendorn*, it was reasonably foreseeable that discharging a shotgun twice in a small beauty salon would result in injury to persons other than the intended target of the shooting. In this case, by contrast, neither the tortfeasor nor her victim could have reasonably foreseen that the pulling and pushing recorded on the video would result in Ms. Francis's death. Accordingly, this Court must conclude, based upon the record before it, that while Ms. Carr's physical attack upon Ms. Francis was intentional, the result that "actually followed"—Ms. Francis's death—was neither intended nor reasonably foreseeable by Ms. Carr.

### 2. The Language of the Exclusion Is Confusing and Contradictory and Therefore Fails to Exclude Coverage Where the Injury Was Not Reasonably Foreseeable.

The holdings in *Farmer in the Dell*, *Hackendorn*, and *Camac*, together with the facts of this case, would seem to settle the issue of the exclusion's applicability—*i.e.*, that the exclusion does not apply because the bodily injury in this

---

[36] *Cannon*, 181 A.3d at 618-19, 625.

case, Ms. Francis's death, was neither "expected" nor "intended." The question of the exclusion's applicability, however, is complicated by the fact that, as noted previously, the exclusionary language before the Court differs from that in *Farmer in the Dell*, *Hackendorn*, and *Camac*. The policy in this case does not simply purport to exclude bodily injury or property damage that is "expected or intended" by the insured, but instead states that coverage

> do[es] not apply to **"bodily injury"** or **"property damage"**:
>
> a. Which is reasonably expected or intended by any **"insured"** even if the resulting **"bodily injury"** or **"property damage"**:
>
> > (1) Is of a different kind, quality or degree than initially expected or intended . . . .

The problem here is that the language chosen by the insurer is both confusing and internally contradictory. Specifically, the policy language provides no explanation of how the bodily injury or property damage for which the exclusion purports to exclude coverage differs from the "resulting 'bodily injury' or 'property damage.'" In other words, the bodily injury or property damage for which the exclusion purports to exclude coverage appears to be one and the same with the "resulting" bodily injury or property damage, but the exclusionary language attempts to draw a distinction between the two—a logical impossibility.

As the Delaware Supreme Court explained in *Novellino, supra*, an insurance

16

contract is construed against the insurer when there is "ambiguity in the language employed or confusion in the deliberate selection of language. . . ."[37] The language of this exclusion is ambiguous at best, and utterly confusing at worst. Is "'bodily injury' or 'property damage'. . . [w]hich is reasonably expected or intended by any 'insured'" the injury or damage that actually results from the insured's intentional conduct, or is it some injury or damage in the mind's eye of the insured? If the former, how can it be "different" from the "resulting" injury or damage? If the latter, how can it be injury or damage for which coverage is in fact excluded?

The insurer may have intended to state that coverage is excluded where the insured reasonably expects or intends **some** injury or damage, even if the injury or damage that actually results is neither expected nor intended. The problem here, however, is that the language of the policy does not so state. The Court is left with contradictory, not clear and unequivocal, language, and therefore USAA cannot carry its burden to prove that the exclusion applies.

In *State Farm Mutual Automobile Insurance Co. v. Johnson*, the Delaware Supreme Court first adopted the doctrine of reasonable expectations—that, because insurance policies "'are not talked out or bargained for as in the case of contracts generally . . . [and] the insured is chargeable with its terms because of a business

[37] *Novellino*, 216 A.2d at 422.

17

utility rather than because he read or understood them . . . hence an insurance contract should be read to accord with the reasonable expectations of the purchaser so far as its language will permit.'"[38]  In *Hallowell, supra*, the Supreme Court clarified the meaning of the phrase "so far as its language will permit," *i.e.*, that the reasonable expectations doctrine applies only "if the terms [of the policy] are ambiguous or conflicting, or if the policy contains a hidden trap or pitfall, or if the fine print takes away that which has been given by the large print."[39]  Here, the terms of the "intentional tort" exclusion are ambiguous and conflicting, and the insured is therefore entitled to her reasonable expectations based upon the holdings of *Farmer in the Dell, Hackendorn*, and *Camac*—specifically, that coverage is available because the bodily injury that occurred, Ms. Francis's death, was neither intended by Ms. Carr nor reasonably foreseeable by her.

USAA argues that affording coverage to Ms. Carr in this case would yield a perverse outcome, because if Ms. Francis had **not** died from Ms. Carr's intentional assault, coverage would have been denied (presumably because the bodily injury in that case would have been either expected or intended, or both).  Certainly, one rejoinder to that argument is that, in such a case, both Ms. Carr's exposure to liability and Ms. Francis's injuries (for which compensation is ultimately being

---

[38] 320 A.2d 345, 347 (Del. 1974) (quoting *Cooper v. Government Employees Ins. Co.*, 237 A.2d 870, 873 (N.J. 1968)).
[39] 443 A.2d at 927.

sought) would have been much less significant. Beyond that, denying coverage because of the perceived unfairness of the result would involve ignoring both the language of the policy itself and well-established Delaware law regarding interpretation of insurance contracts.

Because the Court has concluded that the exclusionary language is not effective to bar coverage, it need not reach the parties' other arguments, including Ms. Carr's arguments that some of the claims against Ms. Carr are for negligent rather than intentional conduct.

## IV. CONCLUSION

The Court is mindful of the public policy implications of this case, which were also acknowledged by the Court in *Hackendorn*. On the one hand, there is the well-established Delaware rule that an insured "shall not profit by way of indemnity from his own wrongdoing."[40] On the other hand, there is an innocent victim, Ms. Francis, whose heirs and family members would be negatively affected by the denial of coverage for Ms. Carr.[41]

Ultimately, however, the Court must base its decision not upon an analysis of competing public policy considerations but upon the language of the policy before it and upon well-settled authority regarding the proper interpretation of insurance

---

[40] *Hackendorn*, 605 A.2d at 12 (citing *Hudson v. State Farm Mut. Auto. Ins. Co.*, 569 A.2d 1168, 1171 (Del. 1990)).

[41] *See id.* (considering impact of decision upon innocent victim of tortfeasor's conduct).

19

policies. Because the meaning of "accident" in the definition of "occurrence" is ambiguous, and because the language of the intentional tort exclusion is confusing and contradictory, the policy language must be construed against USAA and in favor of Ms. Carr, and USAA will be required to defend and indemnify Ms. Carr in the underlying lawsuits.

**WHEREFORE**, for these reasons, USAA's motion for summary judgment will be **DENIED**, and Ms. Carr's cross motion for summary judgment will be **GRANTED**.

**IT IS SO ORDERED.**

<u>/s/ Noel Eason Primos</u>
Judge

NEP/wjs
*Via File & ServeXpress and U.S. Mail*
oc:    Prothonotary