## Harvey B. Otterman, Jr., Administrator of the Estate of Martin L. Kennelly, Jr. v. Union Mutual Fire Insurance Company, Joseph Colombo and Charles N. Kennelly

[298 A.2d 547]

No. 61-72

Present: Shangraw, C.J., Barney, Smith and Daley, JJ., and Underwood, Supr. J.

Opinion Filed December 5, 1972

*Otterman & Allen*, Bradford, for Plaintiff.

*McKee, Clewley & Fitzpatrick*, Montpelier, for Union Mutual Fire Insurance Company.

*Joseph C. Palmisano, Esq.*, Barre, for Joseph Colombo.

*Richard E. Davis, Esq.*, Barre, for Charles N. Kennelly.

**Smith, J.** This is a petition for declaratory judgment to determine whether or not the Union Mutual Fire Insurance

Company, of Montpelier, is bound to appear and defend certain proceedings presently pending before the Orange County Court involving an action by Joseph Colombo against the Estate of Martin L. Kennelly, Jr.

Involved is the interpretation of a clause in a policy of insurance issued by the defendant insurance company to the late Martin L. Kennelly, Jr., as applied to a factual situation in which Joseph Colombo was shot and wounded by the late Kennelly, Jr. The lower court, after the hearing of evidence, made findings of fact and conclusions of law and ordered the defendant company to defend the action.

The two sections of the policy by reason of which Kennelly, Jr. was insured by the defendant company, which are material to the question presented, are quoted below:

> "COVERAGE L—PERSONAL LIABILITY
>
> The Company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements."

The word "occurrence" is defined in the policy as follows:

> " 'Occurrence' means an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured."

Many of the factual findings made by the lower court are not in dispute. Martin Kennelly, Jr., for some time prior to July 30, 1970, had been having strained relations with both his brother, Charles N. Kennelly, as well as with his ex-wife,

with whom he was attempting to reestablish a relationship. He had threatened both of these people on several occasions, and had expressed an intent to shoot his brother. Some of his feelings toward his brother, at least, had been brought about by the recent death of their father, and he had, at times, been drinking heavily since that event.

On the night of July 30, 1970, Kennelly's ex-wife, because of fear of him, was staying with a Cano family, who lived on the Morrison Farm, so-called. Kennelly had been friendly with the Canos and had often visited their home. About three weeks prior to July 30, 1970, Kennelly, who had been drinking to excess, visited the Cano home, and while engaged in conversation with the Cano family and his ex-wife, became hysterical, threw himself to the floor, kicking, swearing, shouting incoherently and making threats to those present. His deportment on this occasion was described by a witness to it like the tantrum of a small child. The evidence and the findings were that during this three week period before July 30, 1970, Kennelly drank heavily, suffered from loss of memory, had spells of anger, resulting in expressions of incoherent rage.

Late in the evening of July 29, 1970, Kennelly telephoned the Cano residence and talked with both Mr. Cano and his ex-wife. He shouted in a hysterical manner over the phone, accused Cano of interfering with his personal affairs, and threatened physical violence. A woman, with whom Kennelly was living, testified that after this conversation, Kennelly picked up a 38 caliber revolver, owned by him, loaded it, and fired a shot into the darkness from his own door, and that he then started for the Cano residence in his automobile.

Kennelly arrived in the vicinity of the Cano residence about 1 A.M. on the morning of July 30, 1970, and was heard by the Cano family, yelling and screaming, long before he approached the house. Mr. Cano called the Barre City Police Department for assistance, and in answer to his call, Officer Colombo arrived at the scene. The time then was 1:30 A.M., and the Cano house was in darkness except that a pathway leading to the kitchen door was illuminated.

Shortly after the arrival of Officer Colombo, a shot was heard outside. Officer Colombo telephoned the Barre Police station for assistance, directed the family to go upstairs, and stationed himself in the living room which was directly behind

the kitchen and separated from it by a wall or partition.

After the Canos went upstairs, Kennelly opened the kitchen door and fired a shot into the kitchen, which was then dark. The bullet passed through the wall into the living room and struck Colombo in the abdomen, eventually resulting in the loss to him of one kidney. For fifteen or twenty minutes after the shot was fired, Kennelly was heard engaged in loud and irrational talk with himself. At one point, the phone rang and Kennelly shouted, "Cano, come answer your phone." No one moved in the house.

Kennelly then went out the kitchen door and was accosted by two police officers, who ordered him to drop his weapon. An exchange of gunfire then took place between Kennelly and the police officers in which Kennelly was shot, from which shot he died shortly afterwards. Before his death, Kennelly told Police Officer Newell Freer "Victor Cano is my best friend—I did not mean to harm anyone." In a postmortem examination, a blood sample taken from the body of Kennelly showed the alcoholic content of his blood to be 0.22.

We turn now to those findings of fact to which the defendant insurance company has briefed its exceptions. In our review of such findings, claimed to be made without evidentiary support, we must read the evidence in support of the findings.

In such consideration,

". . . [W]e must have it in mind that it is the trier of the fact to whom is given the sole determination as to the weight of the evidence, the credibility of the witnesses, and the persuasive effect of the testimony. [Citation omitted.] Where a finding is challenged upon the ground that it is without evidentiary support, it must stand if there is any legitimate evidence fairly tending to support it." (Citation omitted.) *Mott* v. *Vinton*, 129 Vt. 413, 427, 281 A.2d 37 (1971).

Finding 13, objected to by the defendant, is:

"Prior to July 30, 1970, the deceased Martin L. Kennelly, Jr., had suffered at least one mental break-

down and had been a patient in a mental hospital in Massachusetts."

Several witnesses testified that the deceased had told them of such incidents in his life, and no objection was made to the admission of such testimony. No objection having been made at the time such evidence was introduced, nothing is presented here for review. *L'Ecuyer* v. *State Highway Board,* 124 Vt. 462, 465, 207 A.2d 260 (1965).

Also, objected to here was Finding 15:

"The deceased had been in an agitated state of mind since the death of his father in December of 1969."

Again, no objection was raised when such evidence was introduced below by the testimony of several witnesses, and there is nothing to review here.

The defendant has briefed exceptions to all the conclusions reached by the lower court in its determination upon the ground that they are not supported by the evidence. The first four of such conclusions are Findings Nos. 30, 31, 32 and 33.

"30. The Court is unable to find that the deceased knew or should have known that Officer Colombo was in the Cano residence at the time he fired the shot into the kitchen or that Officer Colombo or anyone else was hit by the shot he fired."

It is true, as the defendant suggests, that Officer Colombo did turn on the kitchen light for the brief interval during which he telephoned for additional police help, and that Kennelly was somewhere in the vicinity of the Cano residence. But there is no evidence whatsoever that Kennelly observed the kitchen in the short time that the light was on or that he saw Officer Colombo, or anybody else, in the kitchen at that time, or even that Kennelly was in a position to see who was in the kitchen, or what was going on there. The conclusionary finding in No. 31 is supported by the evidence and finding and defendant takes nothing by its exception.

The defendant has also briefed his exceptions on the same ground to Finding No. 32:

"The actions of the deceased on the morning of July 30, 1970 in firing the bullet which accidentally struck Officer Joseph Colombo were not expected nor intended from the standpoint of the insured."

What we have said above on Finding No. 31 is equally applicable here. Nothing in the evidence or the finding indicates to the slightest degree that when Kennelly fired the shot into the darkened kitchen he knew of the presence on the premises of Officer Colombo, and even less that he knew that the officer was in the room behind the kitchen into which the shot was fired.

What has been said is equally applicable to Finding No. 33:

"The Court finds that the deceased did not intend to inflict injury on the person of the Defendant, Joseph Colombo."

There was expert medical opinion evidence before the court that the behavior exhibited during the three weeks period prior to the shooting incident, as well as his history of mental illness, made it highly improbable that the deceased intentionally meant to harm anyone on July 30, 1970, and the court so found (Finding 31). In addition, there was the statement made by Kennelly to the police officer, while wounded and at the point of death, that he "did not mean to harm anyone."

Findings 34 and 35 are legal conclusions by the lower court upon which it based its order.

"34. The injuries sustained by the Defendant, Joseph Colombo, through the acts of the deceased are not excluded from coverage in Defendant's insurance policy and are not excluded by the definition of 'occurrence' in said policy."

"35. Pursuant to the policy of insurance, #GL37567, issued by the Union Mutual Fire Insurance Company to the deceased, said insurance company is required to defend the action pending against the Plaintiff in the Orange County Court concerning the injuries sustained by the Defendant, Joseph Colombo."

■ The "occurrence" in the case before us was the shooting of Officer Colombo by the deceased Kennelly. As we have already seen "occurrence" is defined in the policy issued by the company to Kennelly, as an accident, which results, during the term of the policy, in bodily injury or property damage neither expected nor intended from the standpoint of the insured.

> "A wilful or intentional injury implies positive and aggressive conduct, and not the mere negligent omission of duty. Ballentine's Law Dictionary, 3rd edition, page 669. 'Wilful' means 'intentional' and is used in contradistinction to 'accidental' or 'unavoidable.' A wilful act implies an intention to cause injury. *Anton* v. *Fidelity & Casualty Company of New York,* 117 Vt. 300, 305, 91 A.2d 697. In its customary usage, intentionally means an act done with intention of purpose, designed and voluntary. Webster's Third New International Dictionary. See 46 C.J.S. pages 1106, 1107." *Wendell* v. *Union Mutual Fire Ins. Co.,* 123 Vt. 294, 297, 187 A.2d 331 (1963).

Neither the findings, nor the evidence, in the instant case, indicate in any way that the insured, Kennelly, had any intention to cause injury to Officer Colombo. There was no evidence that Kennelly even knew that Colombo was in the darkened building into which Kennelly fired his revolver, and, indeed, Colombo would not have been hit by the bullet of Kennelly had not that projectile passed through the wall of the room into which it was shot, and by pure accident, hit Colombo, who was in the room beyond that into which the gun was fired. The result of his shot was not expected by Kennelly for there is no evidence that he ever even knew that his shot into the dark had resulted in the wounding of Colombo.

The shooting of Colombo by Kennelly was such an "occurrence", it being neither expected nor intended by the insured, that the Estate of Kennelly is entitled to the coverage afforded Kennelly under "Coverage L—Personal Liability" by the defendant company.

*Judgment affirmed.*