### State of Vermont v. CNA Insurance Companies, Continental Insurance Company and Glens Falls Insurance Company

[779 A.2d 662]

No. 99-276

Present: Dooley, Morse and Johnson, JJ., and Toor, Supr. J., and Gibson, J. (Ret.), Specially Assigned

Opinion Filed July 20, 2001

*William H. Sorrell*, Attorney General, and *William E. Griffin*, Chief Assistant Attorney General, Montpelier, for Plaintiff-Appellant.

*James E. Preston* of *Pierson Wadhams Quinn & Yates*, *Kevin J. Coyle* of *McNeil Leddy & Sheahan*, Burlington, and *Robert M. Kaplan* of *Robson Ferber Frost Chan & Essner, LLP*, New York, New York, for Defendants-Appellees.

**Johnson, J.** Plaintiff State of Vermont appeals and defendants CNA Insurance, Continental Insurance and Glens Falls Insurance cross-appeal from an order of the superior court granting in part and denying in part the parties' motions for summary judgment. The State initiated a declaratory judgment action to determine insurance coverage for potential liability arising from the contamination of the state prison site in Windsor. The trial court held that there was coverage for a civil suit, but no coverage for a state administrative proceeding. We affirm in part, reverse in part and remand for further proceedings.

The State of Vermont operated a state prison on a parcel of land that it owned in the town of Windsor until 1971. Between 1954 and 1958 the state Department of Corrections (DOC) operated a wood treatment facility on the property. Treatment of the wood involved the use of kerosene and pentachlorophenol by state prisoners. In 1976, DOC conveyed part of the property, including the portion on which the wood treatment facility was located, to the Windsor School District.

In 1995, the district filed a complaint with the Vermont Agency of Natural Resources (ANR), asking that the agency hold DOC responsible for environmental contamination at the site of the former Windsor Prison. At the same time, the district submitted a complaint directly with DOC asking that the department share the costs of testing the site and any clean-up costs. Subsequently, the district filed a civil action in federal district court against DOC, alleging that it had released hazardous substances from its wood treatment facility to the soil and groundwater; the district sought an order requiring the department to rehabilitate the site. This suit was later dismissed without prejudice. The district also filed a civil action against DOC in Washington Superior Court alleging substantially the same claims as in the federal action. During this period, ANR proceeded against DOC, in part directing DOC to retain a consultant to investigate the extent of contamination and possible methods of remediation.

The State of Vermont purchased comprehensive general liability (CGL) insurance from the Glens Falls Insurance Company. Glens Falls is now owned by Continental Insurance Company and both are CNA affiliated companies. Policies were written for three-year periods for at least most of the years 1963 to 1990. The parties dispute whether there was a policy for the period 1969-1972.

The policies bound the insurer to pay "all sums which the insured shall become legally obligated to pay as damages because of . . . property damage to which this insurance applies, caused by an occurrence, and the [insurer] shall have the right and duty to defend any suit against the insured seeking damages on account of such . . . property damage" (quoting from policy 1981-1984). Starting in 1984, the policies included a pollution exclusion, and the State represents that it has not claimed coverage for any period after 1984.

The State brought a declaratory judgment action to determine defendants' obligation to defend and indemnify the State in both the civil action in Washington Superior Court and the ANR proceedings. Both sides moved for summary judgment. The trial court awarded partial summary judgment to the State on the "issues of coverage" raised by the district's civil suit, and awarded partial summary judgment to defendants on the "issue of indemnity for expenses arising out of the administrative [ANR] proceedings." The court found that because ANR is part of the same branch of government as the agency under investigation, both of which are ultimately responsible to the governor, the proceedings are the equivalent of the same entity suing itself.

The State appeals, arguing that defendants are obligated to defend and indemnify the State in the ANR proceeding because the proceeding is a suit and DOC would be legally obligated to pay any damages assessed by ANR. Defendants cross-appeal claiming there is no coverage for the civil suit because the contamination is not an "occurrence" under the policy, and that there was no proof of property damage during the policy periods. Defendants also raise a number of issues that challenge the extent of their liability for either proceeding. Defendants point to a pollution exclusion clause in the 1981 policy and "owned" and "alienated" clauses in the 1981 and 1963 policies, which they believe limits coverage for the contamination on the prison site. Finally, defendants raise the issues of whether CNA and Continental are proper defendants, and whether the trial court's disposition was final for the purpose of review on appeal.

## I. Jurisdiction

Defendants argue that because the trial court failed to address a number of the issues they raised on summary judgment, the court's judgment is not final and thus not ripe for appeal. It is elementary that "a final judgment is a prerequisite to appellate jurisdiction." *Hospitality Inns v. South Burlington R.I.*, 149 Vt. 653, 656, 547 A.2d 1355, 1358 (1988). " 'The test of whether a decree or judgment is final is whether it makes a final disposition of the subject matter before the Court.' " *Morissette v. Morissette*, 143 Vt. 52, 58, 463 A.2d 1384, 1388 (1983) (quoting *Woodard v. Porter Hospital, Inc.*, 125 Vt. 264, 265, 214 A.2d 67, 69 (1965)). We require "that the decree or judgment disposed of all matters that should or could properly be settled at the time and in the proceeding then before the court." *In re Estate of Webster*, 117 Vt. 550, 552, 96 A.2d 816, 817 (1953). As in this case, where multiple claims are involved, any decision that "adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action." V.R.C.P. 54(b).

From its order, it is clear that the court intended its ruling to be final. At the conclusion of the court's order, the court stated, "Should either party require a more formal declaratory judgment, it may submit one within ten days. Barring such submission, the foregoing shall constitute the judgment of the court." Here, defendants contend that the court's judgment, in fact, is not final because the court did not address each claim that defendants raised to limit their liability under the policy. We agree with defendants that the court failed to address several issues that needed to be addressed, see

*infra* part IV. The trial court's resolution of the case did not render these issues irrelevant or superfluous. Because the court decided that defendants are liable for coverage for the civil proceeding, it should have addressed all the claims that purport to limit defendants' liability for that coverage. The court left several claims undecided, and thus the legal rights and liabilities of each party were not resolved conclusively.[1]

We must conclude, therefore, that the court's order is not a final judgment, and a proper appeal lies only pursuant to V.R.A.P. 5. *Huddleston v. Univ. of Vt.*, 168 Vt. 249, 251, 719 A.2d 415, 417 (1998). None of the procedures for perfecting an interlocutory appeal was followed in this case. See V.R.A.P. 5. According to V.R.A.P. 2, however, we have discretion to suspend "application of Rule 5 where dismissal would most likely result in another appeal after remand, the merits of the question of law were fully briefed and argued, and the Court has expended valuable time on the case." *In re Smith*, 169 Vt. 162, 167, 730 A.2d 605, 609 (1999). Given that these requirements have been met in this case, we may entertain this appeal under V.R.A.P. 2. Further, because ultimately we reverse the court on several issues, the interests of judicial economy compel us to rule on those claims that the court did reach. Therefore, consistent with the court's explicit intent, we will treat the court's ruling as one for partial summary judgment under V.R.C.P. 54(b). See *In re E.W.*, 169 Vt. 542, 543, 726 A.2d 58, 60 (1999) (mem.).

## II. ANR Proceeding

Defendants contend that the ANR administrative proceeding is not a suit and therefore is not covered by the policy. The court agreed that the policy did not contemplate paying for sums arising out of an administrative proceeding as opposed to a more traditional legal judgment. As noted above, defendants have a "duty to defend any suit against the insured seeking damages." The policies do not, however,

---

[1] The concurrence notes that trial courts routinely resolve cases without addressing every issue raised by the parties. In this case, however, the issues not resolved were not merely "frivolous" or "resolved based on one or more [other] issues." This case resulted, in part, in a judgment for the plaintiff, and the trial court ignored several substantive claims raised by the defendants that could have absolved them of liability. A trial judge must dispose of a case, not resolve every issue brought by a party. The concurrence's view that we rely on the trial judge's intent is misplaced. It is this Court's obligation to review objectively the record to determine if all dispositive claims have been reached. It is of no moment what the trial judge's intent was.

define "suit." At issue, then, is whether the ANR proceeding is a "suit" for the purposes of the policy.

In construing an insurance policy, disputed terms should be read according to their plain, ordinary and popular meaning. *American Protection Ins. Co. v. McMahan*, 151 Vt. 520, 522, 562 A.2d 462, 464 (1989). Because a policy is prepared by the insurer, all ambiguities must be resolved in favor of the insured. *Peerless Ins. Co. v. Wells*, 154 Vt. 491, 494, 580 A.2d 485, 487 (1990). Further, the burden is on the insurer to show that a third party's claim against the insured is entirely excluded from coverage. *Village of Morrisville Water & Light Dep't v. United States Fid. & Guar. Co.*, 775 F. Supp. 718, 725 (D. Vt. 1991).

In 1995, ANR directed DOC to undertake investigative work at the prison site intended to define the degree and extent of contamination, determine the risk posed to the public, and evaluate methods of any corrective action. This action took the form of letters from the Commissioner of the Department of Environmental Conservation to the Commissioner of DOC. Based on the result of this investigation, ANR also required responsible parties to undertake a clean-up of the site, including excavation of the most contaminated soils. In response to these proceedings, DOC hired private firms to facilitate and execute the remediation plan. Although these steps are not a "suit" in the traditional sense, they are sufficiently adversarial in nature to constitute a "suit" in a broader interpretation. Our interpretation is consistent with other courts that have addressed similar issues, particularly in actions brought by the Environmental Protection Agency (EPA). See *Governmental Interinsurance Exch. v. City of Angola*, 8 F. Supp. 2d 1120, 1130 (N.D. Ind. 1998) ("The vast majority of courts around the United States . . . have found that all kinds of coercive administrative actions are 'suits' covered by general liability insurance policies.") (internal quotations and citations omitted); *Vermont Gas Sys. v. United States Fid. & Guar. Co.*, 805 F. Supp. 227, 232 (D. Vt. 1992) (EPA special notice letter triggers duty to defend); *Village of Morrisville*, 775 F. Supp. at 733 (EPA notification that town was a potentially responsible party for contamination is suit under CGL policy). We see no reason to treat compliance with a state environmental regime differently from a federal one. Instead, we look to whether the official action is "sufficiently coercive and adversarial in nature." *Village of Morrisville*, 775 F. Supp. at 733. The record indicates that the clean-up undertaken by DOC of the site was in

response to the coercive adversarial nature of ANR's requests. These proceedings should therefore be treated as a "suit" by the CGL policy.

The letters sent by ANR to DOC were motivated not by any discretionary desire to intervene, but rather mandated by the legislative scheme for managing hazardous waste. The legislature has vested authority to enforce the hazardous waste statutes in the secretary of ANR. See, e.g., 10 V.S.A. § 8003(a)(12) (secretary of ANR may enforce Vermont statutes "relating to solid waste, hazardous waste and hazardous materials"); id. § 6604(a) ("the secretary shall publish and adopt . . . a solid waste management plan"); id. § 6604a(a) ("[t]he secretary . . . shall develop a plan for the receipt, treatment and disposal . . . of soils contaminated"); id. § 6610a(a) (detailing powers of secretary to enforce waste management statutes).

The legislature has also broadly defined the scope of hazardous waste liability. Section 6615 provides in part:

> [A]ny person who at the time of release or threatened release of any hazardous material owned or operated any facility at which such hazardous materials were disposed of . . . shall be liable for abating such release or threatened release, and costs of investigation, removal and remedial actions incurred by the state which are necessary to protect the public health or the environment.

Id. § 6615(a)(2), (4)(A), (B). The legislature was explicit that this liability was intended to be enforced against state agencies. Id. § 6602(6) (defining person as including "the state of Vermont or any agency, department or subdivision of the state"). Because ANR is the agency entrusted with enforcing the hazardous waste statutes and the statutes specifically apply to state agencies, including DOC, the statutory scheme must have contemplated an action by ANR against another department like DOC. Therefore, DOC's liability for any cost of investigation or clean-up as required by statute would be damages covered by the policy.

Defendants argued and the trial court held that any "damages" resulting from the ANR proceedings against DOC would not be covered by the policy because both entities are agencies in the executive branch whose commissioners serve at the pleasure of the governor. Under these circumstances, the court held, any judgment by one agency against another would be the result of an action that was essentially controlled by the same person. The court feared that aspects of the case such as the zealousness of the defense or the

prosecution, the forms of relief requested, and any decision to appeal could be tainted by the unified interest of the executive. Therefore, the court denied insurance coverage for the proceeding. The trial court based its conclusion on one case for the proposition that the "same person cannot be both plaintiff and defendant at the same time in the same action." *Globe & Rutgers Fire Ins. Co. v. Hines*, 273 F. 774, 777 (2d Cir. 1921). We find this authority unpersuasive and contrary to the modern trend.

Allowing one agency to proceed against another is neither unprecedented nor unusual. The United States Supreme Court addressed the issue of whether the government could sue itself in *United States v. Interstate Commerce Comm'n*, 337 U.S. 426 (1949). In that case, in which the United States was suing the ICC to abate wharfage charges, the Court held that "courts must look behind names that symbolize the parties to determine whether a justiciable case or controversy is presented." *Id.* at 430; see also *United States v. Nixon*, 418 U.S. 683, 697 (1974) (dispute between special prosecutor and president presents traditionally justiciable issue). More recently, the Court has held that the EEOC has the authority to require federal agencies to pay compensatory damages in employment discrimination cases. *West v. Gibson*, 527 U.S. 212, 217 (1999). Similar to our analysis here, the Court read the statutory language at issue (Title VII) as an explicit grant of authority to the agency to levy damage awards upon other federal agencies. *Id.*; see also *Tennessee Valley Authority v. United States*, 13 Cl. Ct. 692, 697 (1987) ("The mere assertion of a claim of intrabranch dispute, without more, has never operated to defeat . . . jurisdiction.") (internal quotations and citations omitted).

■ The intrabranch dispute between ANR and DOC does not violate any notion of separation of powers or transform the proceeding into a collusive first-party claim. Rather, ANR is proceeding against DOC in a traditionally justiciable controversy just as the agency would have against a private party. There is no evidence that the governor has any intent to interfere in these proceedings to alter the behavior of either agency. The steps taken by the secretary of ANR against DOC were not taken at the direction of the governor, but instead imposed by a statutory duty. Likewise, DOC's response is not controlled by the governor but instead by a legislative scheme that renders state agencies beholden for violations of the hazardous waste statutes. We therefore hold that the trial court incorrectly concluded that there could be no coverage under the policy for the ANR proceedings.

## III. Civil Proceedings

Defendants' cross-appeal argues that the trial court erred in granting summary judgment to the State on the issue of coverage for the civil suit. The basis for this appeal is that the State did not provide sufficient evidence on the record that there was property damage, that any damage was caused by an "occurrence," or that the "occurrence" happened during the policy period.

First, we address the issue of property damage under the policy. The record thoroughly documents that the prison site in Windsor is currently contaminated with several hazardous chemicals. Analytical data from monitoring wells installed by ANR confirmed the presence of pentachlorophenol (PCP), kerosene, and dioxin. A letter written by the Waste Management Division of ANR in May 1997 describes the problems with this contamination as follows: "significant long term human health risk at the site due to the release of contaminants from the past wood treatment operation. . . . [s]hort term risk due to the stockpiling of soils at the site requires corrective action to eliminate direct contact exposure. . . . [l]ong term contamination of groundwater is expected to persist at levels above drinking water standards for possibly thousands of years." In July 1997, ANR concluded that "contamination present at this site presents a threat to public heath and the environment and that it is necessary to take immediate remedial action to minimize the risk." The remedial action has included excavating the grossly contaminated soils and covering all other contaminated areas. Exhibits in the record indicate that clean-up costs of the site have approached one million dollars.

■ It is simply untenable for defendants to claim that there is no evidence of "property damage" on the record. Apparently, defendants would have us hold that soil that requires one million dollars to clean up and groundwater that is undrinkable for millennia are not property damage under the policy. This would be inconsistent with the many courts that have held contamination of soil and water by pollutants is property damage. See *Gerrish Corp. v. Universal Underwriters Ins. Co.*, 947 F.2d 1023, 1030 (2d Cir. 1991) (pollution in stream and groundwater clearly represent actual damage to property); *Port of Portland v. Water Quality Ins. Syndicate*, 796 F.2d 1188, 1194 (9th Cir. 1986) ("oil pollution to water is injury to tangible property"); *Kutsher's Country Club Corp. v. Lincoln Ins. Co.*, 465 N.Y.S.2d 136, 139 (Sup. Ct. 1983) (oil spill is property damage under CGL policy; any argument to the contrary is "preposterous").

■ Next, we address defendants' claim that even if there were property damage, there is no evidence that the damage was the result of an "occurrence" under the policy. An occurrence "means an accident, including continuous or repeated exposure to conditions, which results in . . . property damage neither expected nor intended from the standpoint of the insured." (quoting from 1981-84 policy.) We have previously defined "accident" as an "unexpected happening without intention and design." *City of Burlington v. Nat'l Union Fire Ins. Co.*, 163 Vt. 124, 128, 655 A.2d 719, 721 (1994) (internal quotations and citations omitted). The unexpected nature of an accident describes the harm that is caused, rather than the act involved. *Village of Morrisville*, 775 F. Supp. at 729. That is, an accident can occur under the policy despite the intentional nature of the insured's conduct:

> We have found an accident where the insured shot into a house and injured an unseen person in another room when the bullet traveled through the wall. See *Otterman v. Union Mutual Fire Ins. Co.*, 130 Vt. 636, 642, 298 A.2d 547, 551 (1972). . . .

> We also found an "occurrence" where a sheriff mistakenly seized the wrong property in levying a writ of execution. See *State v. Glens Falls Ins. Co.*, 137 Vt. 313, 317-18, 404 A.2d 101, 103-04 (1979).

*Nat'l Union Fire Ins. Co.*, 163 Vt. at 128-29, 655 A.2d at 721-22. Thus the relevant inquiry in this case is not whether the spilling of chemicals at the prison site was intentional, but rather whether the *harm* that resulted from the spilling was expected or intended by the state. See *Village of Morrisville*, 775 F. Supp. at 729-30.

The distinction between intentional and unintentional harms is best explained by comparing two analogous cases. In *Village of Morrisville*, the federal district court, applying Vermont law, found an occurrence under a CGL policy when the insured intentionally sent PCB-contaminated material to a disposal site. The material was improperly treated by the site and contaminated the soil. The court found that this "intentional act does not negate coverage, because [the insured] neither expected nor intended to damage the site." *Village of Morrisville*, 775 F. Supp. at 730. In contrast, in *National Union Fire Insurance Co.*, we held that there was no occurrence under a CGL policy when the insured reduced its purchase of wood chips from a supplier in breach of a contract between the parties. There, we held that there was no insurance coverage for the injury caused to the

supplier because the insured intended or should have expected that breaching a contract would cause economic harm to the supplier. We distinguished *National Union Fire Insurance Co.* from *Village of Morrisville* because, in the latter, "the insured intended no injury to the party who brought the claim(s) for which coverage was sought." *Nat'l Union Fire Ins. Co.*, 163 Vt. at 129, 655 A.2d at 722.

Defendants argue that the State came forward with no evidence that the harm caused by the spilled chemicals was unintentional or unexpected. On the State's motion for summary judgment, however, the court inferred from the available facts that any damage caused by the chemicals was unintentional. Because defendants did not offer any countervailing evidence that the harm caused by the treatment chemicals was, in fact, intentional, the court held that the damage to the prison site was an occurrence within the meaning of the policy. On appeal, defendants claim that the court incorrectly placed the burden of proof on the insurer to demonstrate that the harm was caused intentionally.

We have yet to address the question of which party bears the burden of proving whether the property damage was an "occurrence" in a CGL policy. That is, whether the insured bears the burden of proving that the property damage was *unintended or unexpected* or whether the insurer has the burden of proving that the property damage was *intended or expected*. Because the question of whether there was intent to harm the property remains unresolved, where this burden lies will determine whether there was an "occurrence" under the policy.

The cases in other jurisdictions are plainly split on the issue. According to New York, New Jersey, and Colorado law, the insurer bears the burden of proving that the insured expected or intended the property damage in environmental contamination cases. See *Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp.*, 73 F.3d 1178, 1205 (2d Cir. 1995); *Broderick Inv. Co. v. Hartford Accident & Indem. Co.*, 954 F.2d 601, 606 (10th Cir. 1992); *Carter-Wallace, Inc. v. Admiral Ins. Co.*, 712 A.2d 1116, 1125 (N.J. 1998). The rationale for these holdings is that the "expected and intended" language from the policies resembles the exclusionary language found elsewhere in CGL policies, such as pollution exclusions. See *Stonewall Ins.*, 73 F.3d at 1205; *Carter-Wallace*, 712 A.2d at 1126. Because the insurer bears the burden of proving that an exclusion in the policy precludes coverage, the burden is on the insurer to prove the insured intended or expected the harm caused. *Stonewall Ins.*, 73 F.3d at 1205; *Broderick Inv.*, 954 F.2d at

606; *Carter-Wallace*, 712 A.2d at 1125; see also *City of Burlington v. Associated Elec. & Gas Ins. Servs., Ltd.*, 170 Vt. 358, 363, 751 A.2d 284, 288 (2000) (insurer bears the burden of showing that claims are excluded by a policy). In *Stonewall Insurance*, the court specifically acknowledged that the exclusionary language usually appears in the definition section of the policy rather than the exclusion part of the policy. Nevertheless the court held that the language's exclusionary effect, not its location, determines the allocation of the burden of proof. 73 F.3d at 1205.

Other states have held that the burden ought to rest with the insured. E.g., *Waller v. Truck Ins. Exch., Inc.*, 900 P.2d 619, 625-26 (Cal. 1995); *Arco Indus. Corp. v. Am. Motorists Ins. Co.*, 531 N.W.2d 168, 182 (Mich. 1995) (Boyle, J., concurring); *Newell v. State Farm Fire & Cas.*, 901 S.W.2d 133, 136 (Mo. Ct. App. 1995); *Queen City Farms, Inc. v. Cent. Nat'l Ins. Co.*, 882 P.2d 703, 715 (Wash. 1994). These cases do not treat the "neither expected nor intended" language as an exclusion but rather as a fundamental requirement for coverage. Proving that the harm was unintentional or unexpected is viewed as merely fulfilling the insured's obligation to show that the property damage falls within the coverage of the policy. See, e.g., *Queen City Farms*, 882 P.2d at 715. Many of these cases, however, contain little or no discussion to support this position. See *Waller*, 900 P.2d at 625-26; *Newell*, 901 S.W.2d at 136.

In our judgment, the burden should be placed on the insurer. The facts of the case before us illustrate why. Here, the events in question occurred almost fifty years ago. This was a time when little was known about the danger of the chemicals used at the site. The events predate the creation of the state's environmental agency by fifteen years. See 1969, No. 246 (Adj. Sess.), § 2 (creating the precursor to ANR). No evidence exists to show the intent of the insured, other than that its operations resulted in discharges. It is a reasonable inference that there was no intent to harm the environment from this operation; however, if the burden were on the insured, this amount of proof would be insufficient to prove an occurrence. Under these circumstances, the most the insured could come forward with are nonprobative, self-serving attestations that it did not expect or intend to cause harm to the environment. Therefore, coverage is more likely to be denied on legitimate claims — not because the insurer has any reason or evidence to think there is no coverage, but because the insured will be left with proving a negative. *Carter-Wallace*, 712 A.2d at 1126 (requiring insured to prove a negative fact is impractical).

If we place the burden on the insurer, there is a greater likelihood that the coverage issue will be fully aired because the insurer will be required to come forward with some evidence that puts intent at issue. Moreover, the insurer is the party with the incentive to develop such evidence. The insured makes out a prima facie case for coverage by producing evidence of the harm, and the insurer has an opportunity to rebut that case by producing evidence that there was actual intent to harm. If no evidence of intent to harm exists, then the policy is construed in the light most favorable to the insured, in line with our case law. *Cooperative Fire Ins. Ass'n v. White Caps, Inc.*, 166 Vt. 355, 360, 694 A.2d 34, 37 (1997) (Court routinely construes insurance policies in favor of the insured); *Stonewall Ins. Co. v. Moorby*, 130 Vt. 562, 566, 298 A.2d 826, 829 (1972) (same).

Although our prior cases do not resolve this issue, our holding is not inconsistent with them. See *Espinet v. Horvath*, 157 Vt. 257, 260, 597 A.2d 307, 309 (1991) (Court reversed summary judgment for the insurer when, "giving [the insured] the benefit of all reasonable doubts and inferences, we cannot say that the circumstances conclusively indicate [the insured] knew he would hit and injure plaintiff"); *State v. Glens Falls Ins. Co.*, 137 Vt. 313, 317, 404 A.2d 101, 104 (1979) (Court relied on the fact that there was no showing that sheriff knew to whom mobile home belonged in finding harm from erroneous seizure was unintended or unexpected); *Otterman v. Union Mut. Fire Ins. Co.*, 130 Vt. 636, 642, 298 A.2d 547, 551 (1972) (lack of evidence to show insured's intent to harm bolstered finding that shooting was unexpected and unintended). These cases rely on the absence of evidence to show intentional harm to find coverage, and do not require the insured to prove anything about its own intent.

Thus, we find that the trial court committed no error in allocating to defendants the burden to prove that the harm was intended or expected. As the court correctly noted, "the carrier has certainly come forward with no affirmative evidence" that the environmental harm was either expected or intended. In fact, the only evidence on the issue of intent of harm is a bit of anecdotal evidence presented in a letter from DOC to the town of Windsor:

> According to the information we have received, there was never any intentional disposal of wastes at the [prison] site, however. We do not have records on how much waste was generated, but apparently the wood treatment operation re-

sulted in some limited release of wastes . . . as a result of minor dripping and runovers.

Defendants would deny coverage based on the argument that this "minor dripping" was intended to harm the environment, and therefore, there was no "occurrence" within the meaning of the policy. For the reasons discussed above, however, we hold that in the absence of proof of intentional harm to the ground, the damage to the ground in Windsor was an "occurrence" within the meaning of the policy.

Finally, we address defendants' argument that even if there was an "occurrence," there is no evidence that it happened during the policy period. On this point, we agree with defendants. The record contains sufficient evidence to conclude that in the 1950s chemicals were spilled, and that there was property damage in the 1990s when the site was investigated by ANR. The record leaves substantial gaps, however, as to the condition of the property between 1963 and 1984, the period for which the State alleges policy coverage.

At trial, the court adopted the "continuous trigger" theory to find coverage during the policy periods. Under the continuous trigger theory, coverage exists for property damage that is "continuous or progressively deteriorating throughout successive policy periods . . . The timing of the accident . . . is largely immaterial to establishing coverage . . . Neither is the date of discovery of the damage or injury controlling . . . ." *Montrose Chem. Corp. of Cal. v. Admiral Ins. Co.*, 913 P.2d 878, 894 (Cal. 1995).[2] Whether Vermont would adopt the continuous trigger theory, however, is not properly before this Court. In view of the lack of evidence on this point, we decline to reach this issue at this time.

Even if we were to adopt the continuous trigger test, however, the record, at present, does not contain enough information to support the court's ruling that the trigger was met. "Whether the damages and injuries alleged were in fact 'continuous' is itself a matter for final determination by the trier of fact." *Id.* at 907. For the court to rule on summary judgment that the property damage was continuing or progressively deteriorating throughout the policy period implies that there is no dispute as to material fact on this issue. See V.R.C.P. 56(c). The sparseness of the record does not support this conclusion. Indeed, there is little in the record to fill the causal gap between the "minor

---

[2] For a comprehensive discussion of the trigger theories, see *Village of Morrisville*, 775 F. Supp. at 730-31; *Montrose Chemical*, 913 P.2d at 893-96; *Owens-Illinois, Inc. v. United Ins. Co.*, 650 A.2d 974, 980-81 (N.J. 1994).

dripping" in the 1950s and the contamination discovered in the 1990s. Where there is no evidence before the court as to what happened at the prison site between 1963 and 1984, it was error to infer that the damage occurred during the policy periods.

### IV. Additional Claims Not Addressed by the Trial Court

Defendants raise several additional defenses aimed at limiting or precluding coverage for both the ANR proceeding and the civil proceeding. These claims are that: 1) an "owned" and "alienated" exclusion exists in the 1981 and 1963 policies, and those exclusions limit or preclude coverage for the damage to the prison site for those policy periods; 2) a pollution exclusion exists in the 1981 policy, and that exclusion should be enforced to limit or preclude coverage for that policy period; 3) a factual dispute exists over whether a policy was issued for the period 1969-1972; 4) a factual dispute exists as to whether CNA and Continental should be liable as defendants because the policies were issued only by Glens Falls Insurance.

On summary judgment the court declined to address any of these issues, even though it appears from the pleadings that they were raised below. Cf. *Spencer v. Killington, Ltd.*, 167 Vt. 137, 140, 702 A.2d 35, 36 (1997) ("We will not reverse a lower court when a party's failure to raise some matter below denied the court an opportunity to consider it.") (internal quotations omitted). We find that these issues must be remanded because the court's disposition left so much unresolved. Without any treatment of these issues by the court, we cannot determine which aspects are factual and may be subject to material dispute, which issues are legal and subject to disposition here, and how each argument might affect liability coverage, which may determine the extent and degree of liability coverage on remand.

*Affirmed in part, reversed in part and remanded for further proceedings not inconsistent with this decision.*

**Toor, Supr. J.,** concurring. I agree with the resolution of this case, but I do not agree that the only basis for this Court's jurisdiction is under V.R.A.P. 2. I believe the decision below was a final judgment.

I agree with the majority that a judgment is final if "it makes a final disposition of the subject matter before the Court." *Woodard v. Porter Hospital, Inc.*, 125 Vt. 264, 265, 214 A.2d 67, 69 (1965). I also agree that a decision that "adjudicates fewer than all the claims . . . shall not terminate the action." V.R.C.P. 54(b). However, I believe that the trial court's decision here satisfies these parameters.

As the majority notes, it is clear that the ruling was intended to be a final order. The fact that the decision did not reach every issue raised by the parties does not, in my view, make it nonfinal. Trial judges routinely resolve cases without reaching every issue raised by the parties. This occurs, for example, because the case can be resolved based on one or more issues without the need to reach other issues, or because some issues raised are frivolous. The failure to rule on every issue does not make the decision nonfinal.

If a trial court is correct that it does not need to reach all issues because those it does reach dispose of the case, an appeal should still lie from the issues the court does resolve. If the court is incorrect, as we hold here, in deciding it does not need to reach certain issues, then exactly what we do here should always be done: an appeal should lie and this Court can reverse and remand for resolution of those additional issues. Rather than saying that such appeals are only available on a discretionary basis under V.R.A.P. 2, I would hold that they are always available when the trial court clearly intended its decision to be final.

I do not believe the cases cited by the majority require a different result. Despite its broad language, the *Morissette* case actually held only that two separate orders which together disposed of all the issues in the case created a final judgment, and did not need to be combined in one document. *Morissette v. Morissette*, 143 Vt. 52, 58, 463 A.2d 1384, 1388 (1983) ("The fact that the final judgment was not embodied in a single document is irrelevant."). The *Hospitality Inns* case merely restated the final judgment rule and then adopted an exception to it for interlocutory orders requiring a transfer in the ownership of real property. *Hospitality Inns v. South Burlington R.I.*, 149 Vt. 653, 656-57, 547 A.2d 1355, 1358 (1988). The *Woodard* case, although it does contain language about the trial judge failing to settle all of the issues, was actually a case in which the defendant appealed from a decision denying its motion to dismiss. Thus, although it is somewhat unclear what the trial court did next in *Woodard*, that case can be seen as merely stating the usual rule that an appeal does not lie from the denial of a motion to dismiss.

I believe the language of the cases requiring that all issues be disposed of means *not* that the trial court must address each issue raised, but that no issues can remain *pending* before the trial court. See *In re Newton Enterprises*, 167 Vt. 459, 462, 708 A.2d 914, 916 (1998) (finding that "there is not yet a final judgment" because "the enforcement action is still pending before the environmental court.").

Accord *Peterson v. Peterson*, 715 So. 2d 977, 979 (Fla. Dist. Ct. App. 1998) (noting that final judgment below is reversed and that the trial court must address on remand issues it did not address before); *Belyeu v. Coosa County Bd. of Educ.*, 998 F.2d 925, 927-28 (11th Cir. 1993) (trial court "rendered final judgment" even though it "did not reach" an issue presented by the parties); *Eastpointe Property Owners' Ass'n v. Cohen*, 505 So. 2d 518, 521 (Fla. Dist. Ct. App. 1987) (reversing final judgment below because the court erred in not reaching an issue).

I would hold that where the intent of the trial court to enter final judgment is clear, and nothing remains open in that court, the final judgment rule is satisfied.