# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

June 11, 2014

Lyle W. Cayce
Clerk

No. 13-20360

MCGINNES INDUSTRIAL MAINTENANCE CORPORATION,

Plaintiff–Appellant

v.

THE PHOENIX INSURANCE COMPANY; THE TRAVELERS INDEMNITY COMPANY,

Defendants–Appellees.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:11-CV-4000

Before BARKSDALE, CLEMENT, and OWEN, Circuit Judges.

PER CURIAM:*

This diversity action involves an important and determinative question of Texas law as to which there is no controlling Texas precedent. Accordingly, we certify the unresolved question to the Supreme Court of Texas.

CERTIFICATION FROM THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT TO THE SUPREME COURT OF TEXAS, PURSUANT TO ART. 5, § 3-c OF THE TEXAS CONSTITUTION AND RULE 58 OF THE TEXAS RULES OF APPELLATE PROCEDURE

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 13-20360

TO THE SUPREME COURT OF TEXAS AND
THE HONORABLE JUSTICES THEREOF:

### I. Style of the Case

The style of the action is *McGinnes Industrial Maintenance Corporation, Plaintiff–Appellant v. The Phoenix Insurance Company; The Travelers Indemnity Company*, *Defendants–Appellees*, Case No. 13-20360, in the United States Court of Appeals for the Fifth Circuit, on appeal from the United States District Court for the Southern District of Texas, Houston Division. Federal jurisdiction over the case is based on 28 U.S.C. § 1332.

### II. Statement of the Case

McGinnes Industrial Maintenance Corporation is in the waste disposal business. In the 1960s, McGinnes removed waste from a paper mill and released it into three ponds located adjacent to the San Jacinto River. Meanwhile, the Phoenix Insurance Company and the Travelers Indemnity Company (collectively, Travelers) issued commercial general liability (CGL) policies to McGinnes covering the years 1967-68, 1968-69, and 1970-71.[1] Without defining "suit," the policies all provide,

> [Insurer] shall have the right and duty to defend any suit against [McGinnes] seeking damages on account of . . . property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient . . . .

In 2005, the EPA began evaluating a site that included the three waste ponds. After determining that the ponds contained hazardous substances, the EPA sought McGinnes's cooperation in further studies of the site by contacting McGinnes four times. The EPA acted pursuant to the Comprehensive

---

[1] McGinnes alleges Travelers also issued CGL policies covering the years 1965-66, 1966-67, and 1969-70, but neither party has been able to locate them.

2

No. 13-20360

Environmental Response, Compensation, and Liability Act (CERCLA), which was passed in 1980 to remedy the serious environmental and health risks posed by pollution and authorizes the EPA to achieve this aim in various ways.[2]

The EPA's first communication with McGinnes was in 2007, when it sent a "General Notice Letter" to McGinnes's indirect parent company, Waste Management. The letter stated that the EPA "has determined that you, Waste Management, are a Potentially Responsible Party (PRP)" because of evidence that Waste Management, doing business as McGinnes, "contributed to the hazardous waste contamination at the Site." The General Notice Letter stated that, because of Waste Management's PRP status, under CERCLA it "may be required to perform or fund cleanup actions" and "may also be responsible for all costs incurred by [the] EPA in responding to conditions at the Site."[3] The letter invited Waste Management "to enter into negotiations toward a settlement" with the EPA.[4]

The second communication was a 2008 letter to McGinnes entitled "Combination General Notice Letter and 104(E) Information Request Letter." In addition to repeating much of what was in the first letter, the second letter indicated that the "EPA is requesting certain documents and information . . . relating to [McGinnes's] barging of waste paper mill sludge to the Site" and its

---

[2] *United States v. Bestfoods*, 524 U.S. 51, 55 (1998) (citing CERCLA, 42 U.S.C. §§ 9601-28); *see also Matter of Bell Petroleum Servs., Inc.*, 3 F.3d 889, 894 (5th Cir. 1993) (explaining that CERCLA gives the President certain powers but the President "has delegated most of his authority under CERCLA to the EPA"); Exec. Order No. 12,580, 52 Fed. Reg. 2923 (Jan. 23, 1987) (delegating various powers under CERCLA to the EPA).

[3] *See* 42 U.S.C. § 9607(a) (parties that have accepted hazardous substances for transport to a hazardous waste site shall be liable for "all costs of removal or remedial action" and "any other necessary costs of response" incurred by other parties).

[4] *See* 42 U.S.C. § 9622(a) (granting the President the authority to enter into agreements with PRPs to perform any response action).

3

business relationships with Waste Management. The letter included fifty-eight questions and required "a separate narrative response for each" question. The letter noted that CERCLA gave the "EPA the authority to require [McGinnes's] response to this information request."[5] The letter further indicated that failure to respond timely could result in fines of $32,500 per day and that furnishing false statements could result in criminal liability.[6]

Next, the EPA sent McGinnes a "Special Notice Letter" in 2009. CERCLA explicitly provides for special notice procedures to facilitate settlement agreements with PRPs.[7] The letter provided,

> The EPA has determined that a Remedial Investigation and Feasibility Study (RI/FS) must now be performed at the Site. The EPA has determined that the use of special notice procedures . . . may facilitate a settlement . . . to perform the RI/FS. Accordingly, [the] EPA offers [McGinnes] this opportunity to enter into RI/FS negotiations because [the] EPA believes that [McGinnes] may be responsible for the cleanup of the Site under [CERCLA].

The letter attached the notice itself, which requested that McGinnes make a "good-faith offer" to settle with the EPA within sixty days.[8] Finally, the notice

---

[5] *See* 42 U.S.C. § 9604(e)(2) (the EPA "may require" persons to furnish information regarding sites); *id.* § 9604(e)(5)(A) ("If consent is not granted regarding any request [for information], the [EPA] may issue an order directing compliance with the request."); *id.* § 9604(e)(5)(B) (the EPA "may ask the Attorney General to commence a civil action to compel compliance" with a request or order for information).

[6] *See* 18 U.S.C. § 1001(a) (criminal penalties for making false statements); 42 U.S.C. § 9604(e)(5)(B) (after a civil action is commenced, a court may assess a civil penalty for noncompliance against persons who unreasonably fail to comply with requests or orders for information).

[7] 42 U.S.C. § 9622(e).

[8] *See* 42 U.S.C. § 9622(e)(2)(B) (providing for the sixty-day window).

said that the EPA had already incurred response costs at the site of $378,863.61 and "demand[ed]" that McGinnes pay such costs.[9]

Several months later, the EPA sent its fourth and final communication: a letter attaching a "Unilateral Administrative Order." Because McGinnes allegedly failed to submit a good faith offer to negotiate, the EPA "concluded that work at the Site can no longer be delayed," and attached an order requiring McGinnes to conduct the Remedial Investigation and Feasibility Study at the site. The order was issued under § 106(a) of CERCLA, which allows the EPA to issue orders "as may be necessary to protect public health and welfare and the environment."[10] The letter provided that McGinnes "will be subject to civil penalties" for each day it refused to comply with the order without cause and warned that failure to comply without cause might result in punitive damages.[11] It ended by stating that the "EPA reserves the right to bring an action . . . for recovery of any response costs incurred" at the site.[12]

McGinnes notified Travelers of the EPA's actions and requested that it provide a defense pursuant to the CGL policies, but Travelers refused to defend, claiming that no suit had been filed. McGinnes then sued Travelers seeking, among other things, over $2 million in attorney's fees as well as a declaratory judgment that Travelers was required to defend it. McGinnes and

---

[9] *See* 42 U.S.C. § 9604(a)(1) (the EPA "is authorized to . . . provide for remedial action relating to" hazardous substances "or take any other response measure" deemed necessary); *id.* § 9607(a)(4)(A) (responsible parties are liable for the costs of such actions).

[10]  42 U.S.C. § 9606(a).

[11] *See* 42 U.S.C. § 9606(b)(1) (a person who fails to comply with an order may be fined for each day of violation or non-compliance in an action brought in a U.S. district court to enforce such order); *id.* § 9607(c)(3) (providing for punitive damages that can be recovered by bringing a civil action for failing to comply with an order without cause).

[12] *See* 42 U.S.C. § 9607(a).

No. 13-20360

Travelers filed cross motions for partial summary judgment as to the duty to defend.

The district court granted Travelers's motion, holding that the EPA's actions were not a suit triggering the duty to defend. The court first noted that when the policies were issued in the late 1960s and early 1970s, CERCLA did not exist. The court continued that "[a]t the time [the policies] were written and priced, the policies understood suit to mean a lawsuit before a neutral magistrate who would decide causation, liability, and actual damages by reference to formal standards." Thus, according to the district court, "[t]he policies covered the risks of lawsuits, but not those of a virulent administrative state." Because the EPA's actions were not a "suit," the district court held that Travelers did not have a duty to defend. The district court certified its order for interlocutory appeal, and this court granted leave to appeal the order.

### III. Legal Issue to be Resolved

The sole question in this action is whether, under Texas law, the EPA's PRP letters and unilateral administrative order, issued pursuant to CERCLA, constitute a "suit" within the meaning of the CGL policies, triggering the duty to defend. The policies are governed by Texas law.[13] Under a CGL policy, "the duty to defend protects the [insured] against the expense of any suit seeking damages covered by the policy."[14] Thus a "breach of the duty to defend entitles the insured to the expenses it incurred in defending the suit, including

---

[13] *See* TEX. INS. CODE ANN. art. 21.42 (West 2013) ("Any contract of insurance payable to any citizen . . . of this State by any insurance company . . . doing business within this State shall be held to be a contract made and entered into under [Texas law] relating to insurance, and governed thereby . . . ."). McGinnes is a Texas corporation.

[14] *Trinity Universal Ins. Co. v. Emp'rs Mut. Cas. Co.*, 592 F.3d 687, 691 (5th Cir. 2010) (internal quotation marks omitted).

reasonable attorney's fees and court costs."[15]  The duty arises when a party "sues the insured on allegations that, if taken as true, potentially state a cause of action within the coverage terms of the policy."[16]

The Supreme Court of Texas and Texas courts of appeals have not determined whether the EPA's actions qualify as a "suit" under a CGL policy, thereby triggering the duty to defend.[17]  The only Texas court to have addressed the issue is a Texas state district court, which held that "suit" in CGL policies was sufficiently broad to include PRP letters in CERCLA-type proceedings.[18]  The court reasoned that PRP letters "are as likely to be coercive as any lawsuit and as likely to carry grave legal consequences."[19]  It held that the test for determining if an order or letter is a "suit" "is whether the insured is legally disadvantaged by the consequences of failing to take the action demanded in the order or letter."[20]

Because of the lack of Texas appellate precedent on the issue, the parties make competing arguments as to why the Supreme Court of Texas would decide the question in their favor.  McGinnes, citing dictionary definitions of "suit," contends that the term is ambiguous: one meaning is narrow and requires legal action in court and the other is broader and means an effort to

---

[15] *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 559 (5th Cir. 2004).

[16] *GEICO Gen. Ins. Co. v. Austin Power Inc.*, 357 S.W.3d 821, 823 (Tex. App.—Houston [14th Dist.] 2012, pet. denied).

[17] 46 EVA FROMM O'BRIEN & ANDREW J. TORRANT, TEXAS PRACTICE SERIES, ENVIRONMENTAL LAW § 34:5 (2d ed. 2013) ("Appellate courts have not addressed the suit issue under Texas law.").

[18] *Gulf Metals Indus. Inc. v. Chi. Ins. Co.*, No. 96-04673, slip op. at 13 (126th Jud. Dist. Ct. Mar. 13, 1998), *aff'd on other grounds*, 993 S.W.2d 800 (Tex. App.—Austin 1999, pet. denied).

[19] *Id.* at 12.

[20] *Id.* at 13.

gain an end by legal process.[21]  Applying the rule that ambiguities in insurance contracts are interpreted in favor of the insured,[22] McGinnes argues that the broader meaning would control and include the EPA's PRP letters and unilateral administrative order.   McGinnes further asserts that its interpretation of "suit" dovetails with the Fifth Circuit's broad interpretation of "damages" in CGL policies governed by Texas law.[23]   McGinnes also contends that the majority of other jurisdictions have interpreted "suit" broadly to cover EPA actions like the ones here.

Travelers emphasizes that Texas contract law requires interpreting contracts consistent with the circumstances and law existing when the contract was entered.[24]   In the time frame in which the CGL policies were issued, Travelers asserts, the Supreme Court of Texas and Texas courts of appeal defined "suit" as a proceeding in a court of justice.   Travelers also contends that construing the word "suit" broadly would render the term "claim" in the policy meaningless.[25]   Travelers adds that a broad definition of "suit"

---

[21] *See, e.g.*, III WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE 2286 (1966) (defining "suit" as, among other things, "the attempt to gain an end by legal process: prosecution of right before any tribunal: LITIGATION").

[22] *See Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 133 (Tex. 2010).

[23] *See, e.g.*, *SnyderGeneral Corp. v. Century Indem. Co.*, 113 F.3d 536, 538-39 (5th Cir. 1997) (holding that, for purposes of an indemnity provision in a CGL policy, the term "damages" covered the payment of environmental cleanup costs even when incurred voluntarily by the insured and not as a result of a court order).

[24] *See Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 285 (Tex. 1998) (stating that Texas law presumes parties intend to define terms how Texas decisions have interpreted them); *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983) ("Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when [it] was entered.").

[25] *See, e.g.*, *Foster-Gardner, Inc. v. Nat'l Union Fire Ins. Co.*, 959 P.2d 265, 280-81 (Cal. 1998) ("[T]he policies do not treat the terms 'suit' and 'claim' as interchangeable, but consistently treat them separately. . . .  This careful separation indicates that the insurers' differing rights

No. 13-20360

violates the eight-corners rule, which provides that "the duty to defend is determined by the claims alleged *in the petition* and the coverage provided in the policy."[26]  According to Travelers, if the term "suit" can refer to the PRP letters and the administrative order, the eight-corners rule cannot be applied since four of the eight corners—i.e., the petition or complaint—are missing. Travelers also criticizes cases from other jurisdictions that adopt a broad definition of "suit" for not adhering to the plain, ordinary meaning of the contract terms.[27]  Travelers argues that the better-reasoned decisions are from states interpreting "suit" narrowly.

In short, this action presents an unsettled question of Texas law.  No Texas appellate case has addressed the issue, the parties each make reasonable arguments in support of their position, and other courts considering the issue have not come to a consensus.  In light of all of this, we respectfully submit that this issue should be decided by the Supreme Court of Texas.

### IV. Question Certified

We hereby certify the following question of law to the Supreme Court of Texas:

> Whether the EPA's PRP letters and/or unilateral administrative order, issued pursuant to CERCLA, constitute a "suit" within the meaning of the CGL policies, triggering the duty to defend.

---

and obligations with respect to 'suit[s]' and 'claim[s]' were deliberately and intentionally articulated in the policies.").

[26] *See Pine Oak Builders, Inc. v. Great Am. Lloyds Ins. Co.*, 279 S.W.3d 650, 654 (Tex. 2009) (emphasis added); *see also Foster-Gardner, Inc.*, 959 P.2d at 281 ("[I]t is because the insurer's duty to defend depends on the allegations in the *complaint* that the insurer may or may not owe a duty to defend those allegations.") (emphasis in original).

[27] *See Gilbert Tex. Constr., L.P.*, 327 S.W.3d at 126 (holding that an insurance "policy's terms are given their ordinary and generally-accepted meaning unless the policy shows the words were meant in a technical or different sense").

No. 13-20360

We disclaim any intention or desire that the Supreme Court of Texas confine its reply to the precise form or scope of the question certified.