# IN THE SUPREME COURT OF TEXAS

═══════════
No. 14-0465
═══════════

McGinnes Industrial Maintenance Corporation, Appellant,

v.

The Phoenix Insurance Company and The Travelers Indemnity Company, Appellees

═══════════════════════════════════════════════════════
On Certified Question from the United States
Court of Appeals for the Fifth Circuit
═══════════════════════════════════════════════════════

**Argued January 15, 2015**

Chief Justice Hecht delivered the opinion of the Court, in which Justice Green, Justice Willett, Justice Devine, and Justice Brown joined.

Justice Boyd filed a dissenting opinion, in which Justice Johnson, Justice Guzman, and Justice Lehrmann joined.

The standard-form commercial general liability ("CGL") insurance policies at issue in this case[1] give the insurer "the right and duty to defend any suit against the insured seeking damages". The United States Court of Appeals for the Fifth Circuit asks[2] whether "suit" includes superfund cleanup proceedings conducted by the Environmental Protection Agency (the "EPA") under the

---

[1] The policies, issued in the late 1960s and early 1970s, were then called comprehensive general liability policies but have since been more accurately referred to as commercial general liability policies. The acronym remains the same. *See* Jeffrey W. Stempel, Law of Insurance Contract Disputes § 14.01 (2d ed. 1999).

[2] 571 F. App'x 329 (5th Cir. 2014) (per curiam).

federal Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA").[3] We agree with the overwhelming majority of jurisdictions to have considered the issue that the answer is yes.

## I

## A

Relief from pollution was first afforded in suits for nuisance and other common law causes of action.[4] The United States Supreme Court held that litigants could bring suit based on the federal common law of nuisance[5] as long as the common law had not been displaced by federal statute.[6] The

---

[3] Pub. L. No. 96-510, 94 Stat. 2767 (codified as amended at 42 U.S.C. §§ 9601–9675).

[4] *See* 3 ENVIRONMENTAL LAW PRACTICE GUIDE § 16.01 (Michael B. Gerrard ed., 2013) (indicating that suits under the common law remain important because most environmental legislation does not provide for the recovery of damages, CERCLA being the major exception); Daniel M. Steinway, *Environmental Law as a System*, *in* ENVIRONMENTAL LAW HANDBOOK ch. 1, §§ 3.8–4.4 (Thomas F.P. Sullivan ed. emeritus, 22d ed. 2014) (electronic version) (discussing common law sources of environmental liability); Jeff Belfiglio, Note, *Hazardous Wastes: Preserving the Nuisance Remedy*, 33 STAN. L. REV. 675, 676 (1981) ("The courts offered damages and injunctive relief from pollution under the common law long before environmental statutes existed. Nuisance has been the most popular doctrine used by the courts in attacking pollution problems."); Robert R. Lohrmann, Comment, *The Environmental Lawsuit: Traditional Doctrines and Evolving Theories to Control Pollution*, 16 WAYNE L. REV. 1085, 1115–1123 (1970); Note, *Strict Liability for Generators, Transporters, and Disposers of Hazardous Waste*, 64 MINN. L. REV. 949 (1980).

[5] *Illinois v. City of Milwaukee*, 406 U.S. 91, 99–100 (1972) ("'As the field of federal common law has been given necessary expansion into matters of federal concern and relationship (where no applicable federal statute exists, as there does not here), the ecological rights of a State in the improper impairment of them from sources outside the State's own territory, now would and should, we think, be held to be a matter having basis and standard in federal common law and so directly constituting a question arising under the laws of the United States.'" (quoting *Texas v. Pankey*, 441 F.2d 236, 240 (10th Cir. 1971))); *see also Federal Common Law of Nuisance Reaches New High Water Mark as Supreme Court Considers* Illinois v. Milwaukee II, 10 ENVTL. L. REP. 10101, 10101 (1980) ("The federal common law of nuisance, which was unknown at the time the National Environmental Policy Act was enacted [in 1969], appears to be coming to the fore as a doctrine offering adaptable and effective relief to victims of pollution.").

[6] *City of Milwaukee v. Illinois*, 451 U.S. 304, 317 (1981) (holding that the Federal Water Pollution Control Act Amendments of 1972 displaced a federal common law nuisance claim for pollution of Lake Michigan).

Resource Conservation and Recovery Act of 1976[7] and other federal statutes often served as other bases for suits by the EPA.[8] State and local governments sued on state statutes and under the common law.[9]

The enactment of CERCLA in 1980 changed the landscape dramatically, giving the EPA "broad power to command government agencies and private parties to clean up hazardous waste sites."[10] The EPA has two options for obtaining a cleanup under CERCLA. "It may conduct the cleanup itself and later seek to recover its costs from potentially responsible parties [('PRPs')] in a subsequent cost recovery action"—a lawsuit—"or it can compel the PRPs to perform the cleanup (either voluntarily or involuntarily) through administrative or judicial proceedings."[11] "[E]veryone

---

[7] 42 U.S.C. § 6973 (1976). The 1976 version of the RCRA provides in part: "[U]pon receipt of evidence that the handling, storage, treatment, transportation or disposal of any solid waste or hazardous waste is presenting an imminent and substantial endangerment to health or the environment, the Administrator may bring suit on behalf of the United States in the appropriate district court to immediately restrain any person for contributing to the alleged disposal to stop such handling, storage, treatment, transportation, or disposal or to take such other action as may be necessary."

[8] *See Hazardous Waste: EPA, Justice Invoke Emergency Authority, Common Law in Litigation Campaign Against Dump Sites*, 10 ENVTL. L. REP. 10034, 10035 (1980); *Justice's Hazardous Waste Prosecutor Expects to File 100 New Cases This Year*, 10 ENV'T. REP. 2243, 2243 (1980) (stating that the Resource Conservation and Recovery Act "largely codified the common law of public nuisance"); Note, *Allocating the Costs of Hazardous Waste Disposal*, 94 HARV. L. REV. 584, 593 n.41 (1981) ("Federal Government suits have also invoked the Refuse Act of 1899 ch. 425, § 13, 33 U.S.C. § 407 (1976), the Federal Water Pollution Control Act § 504, 33 U.S.C. § 1364 (Supp. III 1979), and the Safe Drinking Water Act § 1431, 42 U.S.C. § 300i (1976). These statutes can be important adjuncts to the RCRA since they provide explicitly for recoupment of abatement expenses incurred by the Government, *see*, *e.g.*, 33 U.S.C. § 1321(f) (Supp. III 1979).").

[9] *See Allocating the Costs*, *supra* note 8, at 593–594. In *International Paper Co. v. Ouellette*, 479 U.S. 481 (1987), the United States Supreme Court addressed the interaction of the federal Clean Water Act and state law of nuisance. The Court recognized that the law of the state in which pollution has its source may impose higher common law requirements than federal law, and therefore the source state's law of nuisance may be available as an additional remedy. 479 U.S. at 497–500.

[10] *Key Tronic Corp. v. United States*, 511 U.S. 809, 814 (1994).

[11] Ronald E. Cardwell & Jessica J.O. King, *Comprehensive Environmental Response, Compensation, and Liability Act*, in ENVIRONMENTAL LAW HANDBOOK, *supra* note 4, ch. 9, § 3.0.

3

who is potentially responsible for hazardous-waste contamination may be forced to contribute to the costs of cleanup."[12] The only defenses are an act of God, an act of war, and in some instances, an act or omission of a third party.[13]

As amended, CERCLA also creates a process that begins in the EPA and ends, only if necessary, in the courts. The process starts with a notice letter informing the recipient that it is a potentially responsible party ("PRP").[14] The letter may invite the PRP to negotiate with the EPA over its liability.[15] But because defenses to liability are limited, the invitation is effectively a demand.[16] The EPA can request information and sanction a PRP's failure to respond with significant fines.[17] It can issue a "unilateral administrative order" directing a PRP to conduct a "remedial investigation

---

[12] *United States v. Bestfoods*, 524 U.S. 51, 56 n.1 (1998) (emphasis omitted) (quoting *Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 7 (1989) (plurality opinion of Brennan, J.)); *see* 42 U.S.C. § 9607(a).

[13] 42 U.S.C. § 9607(b).

[14] *See* Interim Guidance on Notice Letters, Negotiations, and Information Exchange, 53 Fed. Reg. 5298, 5302 (Feb. 23, 1988); *see also* Sidney S. Liebesman, Comment, *Triggering an Obligation: Receipt of an EPA PRP Letter and An Insurer's Duty to Defend*, 5 VILL. ENVTL. L.J. 479, 480 (1994); Robin K. Luce, Comment, *If the Threat is Clear: PRP Letters as a "Suit" Within the Duty to Defend Clause*, 3 DET. COLL. L. REV. 1275, 1279 (1993).

[15] Interim Guidance on Notice Letters, Negotiations, and Information Exchange, 53 Fed. Reg. 5298, 5302 (Feb. 23, 1988); *see also* Luce, *supra* note 14, at 1279.

[16] *See Travelers Cas. & Sur. Co. v. Ala. Gas Corp.*, 117 So. 3d 695, 705 (Ala. 2012) (quoting *Mich. Millers Mut. Ins. Co. v. Bronson Plating Co.*, 519 N.W.2d 864, 872 (1994), *abrogated in part by Wilkie v. Auto-Owners Ins. Co.*, 664 N.W.2d 776 (Mich. 2003)).

[17] 42 U.S.C. § 9604(e)(2), (5) (granting authority to request information and setting out statutory penalties of $25,000 per day for noncompliance); 40 C.F.R. § 19.4 (adjusting statutory penalties for inflation).

and feasibility study",[18] or else—the else being civil penalties and punitive damages.[19] The EPA need turn to the courts only for enforcement of its decisions. A PRP cannot seek judicial review until the process is complete,[20] and then only for EPA actions that are arbitrary and capricious, based on the agency's own record.[21] As a practical matter, courts afford PRPs no hope of relief, and consequently they have no choice but to comply with the EPA's directives.[22] There will seldom be a court proceeding.

**B**

In the 1960s, petitioner McGinnes Industrial Waste Corporation dumped pulp and paper mill waste sludge into disposal pits near the San Jacinto River in Pasadena, Texas ("the Site"). In 2005,

---

[18] 42 U.S.C. §§ 9604(b) (authorizing the President to conduct investigations and studies), 9622(a) (granting the President authority to "enter into an agreement with any person", including a PRP, to "perform any response action"—that is, to settle), 9606(a) ("The President may . . . issue[ ] such orders as may be necessary to protect public health and welfare and the environment.").

[19] *Id.* §§ 9606(b)(1), 9607(c)(3).

[20] *Id.* § 9613(h) (limiting federal jurisdiction over any action "to review any challenges to removal or remedial action" to the causes of action authorized by CERCLA itself); *see* Lucia Ann Silecchia, *Judicial Review of CERCLA Cleanup Procedures: Striking a Balance to Prevent Irreparable Harm*, 20 HARV. ENVTL. L. REV. 339, 341–343 (1996) (citation omitted) ("These [jurisdictional] limitations reflect the 'clean up first, litigate later' philosophy behind [CERCLA].").

[21] 42 U.S.C. §§ 9606(b)(2)(D), 9613(j)–(k).

[22] *See Compass Ins. Co. v. City of Littleton*, 984 P.2d 606, 622 (Colo. 1999) (en banc) (citing *Mich. Millers Mut. Ins. Co. v. Bronson Plating Co.*, 519 N.W.2d 864, 871 (Mich. 1994), *abrogated in part by Wilkie v. Auto-Owners Ins. Co.*, 664 N.W.2d 776 (Mich. 2003)) (recognizing the "coercive nature" of CERCLA enforcement); *A.Y. McDonald Indus. v. Ins. Co. of N. Am.*, 475 N.W.2d 607, 628–629 (Iowa 1991) (discussing EPA's powers under CERCLA); *see also* 4A ENVIRONMENTAL LAW PRACTICE GUIDE, *supra* note 4, § 30.05[4] ("Because the filing of litigation to seek a judicial injunction [requiring cleanup] is time-consuming and runs some risk that a court, rather than [the] EPA, will shape the scope and type of relief obtained, [the] EPA's strong preference is to issue an administrative order and then, if necessary, seek enforcement of the order in a court of law. . . . [B]ecause there is generally no pre-enforcement judicial review of such orders, a PRP who receives one and does not comply runs the risk that a court will later find that there was not sufficient cause for the failure to comply and impose steep penalties in addition to ordering a response action at the site.").

the EPA began investigating possible environmental contamination at the Site. In November 2007, the EPA served a general notice letter on McGinnes's parent company, stating that it was a PRP and offering it "the opportunity to enter into negotiations concerning cleaning up the Site and reimbursing EPA for costs incurred". In December 2008, the EPA served a similar letter on McGinnes. That letter included 58 requests for detailed information covering virtually every aspect of McGinnes's involvement with the Site. The letter noted that a failure to respond could result in penalties of up to $32,500 a day.

In July 2009, the EPA sent McGinnes a special notice letter stating that it had determined that McGinnes was responsible for cleaning up the Site and demanding that McGinnes pay $378,863.61 in costs. The letter required McGinnes to make a good-faith offer to settle with the EPA within 60 days. When McGinnes did not make an offer, the EPA issued a unilaterial administrative order directing McGinnes to conduct a "remedial investigation and feasibility study" in accordance with the EPA's specifications. The letter warned McGinnes that its willful failure to comply without cause would subject it to $37,500 per day in civil penalties and punitive damages up to three times the resulting costs to the EPA.

## C

During the time McGinnes was dumping waste at the Site, it was covered by standard-form CGL insurance policies issued by Phoenix Insurance Company and Travelers Indemnity Company (collectively "the Insurers").[23] Each policy provided that

---

[23] The policies were written by the Insurance Services Office, Inc., "the industry organization responsible for issuing nearly all standard CGL forms." *PAJ, Inc. v. Hanover Ins. Co.*, 243 S.W.3d 630, 633 n.1 (Tex. 2008).

> [t]he company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of . . . property damage to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against insured seeking damages on account of such . . . property damage, . . . and may make such investigation and settlement of any claim or suit it deems expedient . . . .

In May 2008, in the interim between the EPA's first two notice letters, McGinnes requested a defense in the EPA proceedings from the Insurers. The Insurers refused on the ground that the proceedings were not a "suit" under the policy.

McGinnes sued the Insurers in federal district court for a declaration that the policies obligated them to defend the EPA's CERCLA proceedings and also seeking attorney fees already incurred. The court granted the Insurers' motion for partial summary judgment on the duty-to-defend issue, denied McGinnes's motion, and certified its order for interlocutory appeal. The United States Court of Appeals for the Fifth Circuit certified to us the following question[24]:

> Whether the EPA's PRP letters and/or unilateral administrative order, issued pursuant to CERCLA, constitute a "suit" within the meaning of the CGL policies, triggering the duty to defend.[25]

As usual, the Circuit "disclaim[ed] any intention or desire that the Supreme Court of Texas confine its reply to the precise form or scope of the question certified."[26]

---

[24] TEX. CONST. art. V, § 3-c(a) ("The supreme court [has] jurisdiction to answer questions of state law certified from a federal appellate court.").

[25] 571 F. App'x 329, 335 (5th Cir. 2014) (per curiam).

[26] *Id.*

7

## II

We agree with the Insurers that "suit" commonly refers to a proceeding in court.[27] Although the word is sometimes defined more generally as "the attempt to gain an end by legal process",[28] the more specific connotation is an attempt through process in court. But for three reasons we think "suit" in the CGL policies at issue must also include CERCLA enforcement proceedings by the EPA.

### A

When the policies at issue were written, the main avenue of redress for pollution was by suing in court on common law or statutory claims. One effect of CERCLA was to authorize the EPA to conduct on its own what otherwise would have amounted to pretrial proceedings, but without having to initiate a court action until the end of the process. The PRP notice letters serve as pleadings. The EPA obtains discovery through requests for information, indistinguishable from interrogatories under the rules of civil procedure. It engages in mediation through its invitations to settle. A unilaterial administrative order resembles summary judgment. The fines and penalties for willful non-cooperation in the process are like sanctions in a court proceeding, only prescribed by statute. And part of the judicial function is ceded to the EPA by limiting a PRP's opportunity for review until the end of the process, and then limiting that review to an abuse of discretion by the EPA, based on its own record.

---

[27] BLACK'S LAW DICTIONARY 1603 (rev. 4th ed. 1968) (defining "suit" as "any proceeding by one person or persons against another or others in a court of justice in which the plaintiff pursues, in such court, the remedy which the law affords him for the redress of an injury or the enforcement of a right, whether at law or in equity").

[28] WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE 2286 (1961) (defining "suit" as "the attempt to gain an end by legal process", "prosecution of right before any tribunal", "an action or process in a court for the recovery of a right or claim" and "a legal application to a court for justice").

McGinnes argues that EPA proceedings are the functional equivalent of a suit, but in actuality, they are the suit itself, only conducted outside a courtroom. Had the EPA wanted to force McGinnes to clean up the Site before 1980, it would have been required to sue first, and the CGL policies would have obligated the Insurers to defend—to challenge the pleadings, to contest the scope of discovery, to engage in mediation on a level playing field, to resist judgment, and to settle—all without fear of being sanctioned at the very end for not having cooperated with the opponent. CERCLA effectively redefined a "suit" on cleanup claims to mean proceedings conducted by one of the parties, the EPA, followed by an enforcement action in court, if necessary. McGinnes's rights under its policies should not be emasculated by the enactment of a statute intended not to affect insurance, but to streamline the EPA's ability to clean up pollution.[29]

The Insurers argue that to hold that their duty to defend applies to EPA enforcement proceedings is to extend that obligation to every demand letter. But a simple demand letter threatening or prefacing a lawsuit is nothing like a PRP letter or unilateral administrative order, which, to use the United States Supreme Court's choice of words, "command" compliance.[30] Likewise, the Insurers' argument that a PRP letter or unilateral administrative order is but a claim,

---

[29] The dissent argues that we are rewriting McGinnes's policies under the assumption that, had it and the Insurers anticipated CERCLA, they would have agreed that the Insurers would have the right and duty to defend those proceedings. We assume no such thing. The parties used the word "suit" to refer to the kinds of proceedings the Insurers had the right and duty to defend. When the policies issued, before CERCLA, the duty to defend would have covered cleanup enforcement proceedings in the only place they could be brought—in court. We hold that the parties' intention should not be defeated by a subsequent federal regulatory statute that authorizes the EPA to conduct those same proceedings itself before going to court. The dissent argues that the real meaning of "suit"—the proceedings and costs it actually entails—and thus the parties' bargain can be changed over time by a federal regulatory statute like CERCLA. We disagree, not despite our duty to interpret the policies as the parties intended in the text, but because of it.

[30] *Key Tronic Corp. v. United States*, 511 U.S. 809, 814 (1994).

as distinguished from a suit in the policies themselves, simply blinks reality. The EPA's demands and directives, backed by threats of fines and penalties, are more like interlocutory rulings than claims. The Insurers argue that EPA proceedings are really pre-suit settlement mechanisms. The point is that before CERCLA those mechanisms were available to the EPA only in judicial proceedings.

The Insurers argue that if "suit" includes CERCLA enforcement proceedings, it must also include all administrative proceedings. We disagree. EPA enforcement proceedings are unusual: not only are they like judicial proceedings, they were judicial proceedings before CERCLA was enacted.

We cannot conclude that CERCLA deprived McGinnes of the coverage for pollution cleanup enforcement proceedings it bought years earlier.

**B**

It is relatively well-settled, in the Fifth Circuit and other courts, that cleanup costs under CERCLA are "damages" covered by the form CGL policies at issue here.[31] The Insurers do not dispute this interpretation of the policies, though they do insist that McGinnes's damages were not the result of an "occurrence"—that is, an accident—under the policies. To interpret the policies as covering the damages incurred as a result of pollution cleanup proceedings without giving the

---

[31] *See, e.g.*, *SnyderGeneral Corp. v. Century Indem. Co.*, 113 F.3d 536, 538–539 (5th Cir. 1997) (holding that "environmental cleanup costs, whether incurred by the federal government under CERCLA or by an individual who voluntarily undertakes the task of cleaning up hazardous waste, are damages and thus are covered"); *Bituminous Cas. Corp. v. Vacuum Tanks, Inc.*, 75 F.3d 1048, 1053 (5th Cir. 1996) ("[G]overnment cleanup costs, incurred in responding to the dumping of hazardous wastes on property, and imposed on the insured by CERCLA, are covered by . . . the policy."); *Aetna Cas. & Sur. Co. v. Pintlar Corp.*, 948 F.2d 1507, 1513 (9th Cir. 1991) ("The plain meaning of 'damages' from the perspective of an ordinary person would include CERCLA response costs."); *Indep. Petrochem. Corp. v. Aetna Cas. & Sur. Co.*, 944 F.2d 940, 947 (D.C. Cir. 1991) (holding that "'damages' includes costs the insured is legally obligated to pay to the United States and Missouri as reimbursement for their activities in remedying environmental harm"). *But see Indus. Enters. v. Penn Am. Ins. Co.*, 637 F.3d 481 (4th Cir. 2011) (interpreting Maryland law).

Insurers the right and duty to defend those proceedings creates perverse incentives and consequences for insurers and insureds alike.

McGinnes argues that an insurer's duty to indemnify without a right or duty to defend creates an incentive for the insured to mount no defense itself, assured that whatever damages result will not be its responsibility but the insurer's. The Insurers argue that an insured who does not defend against incurring damages may be denied coverage for breaching its duty to cooperate with the insurer to avoid such damages. Whether either scenario is likely, both illustrate the problem with a duty to indemnify without a duty or right to defend.[32]

## C

Finally, the Insurers' interpretation of "suit" in these standard-form policies[33] has been rejected by thirteen out of sixteen state high courts to have considered the issue: Alabama, Colorado, Connecticut, Iowa, Kentucky, Massachusetts, Michigan, Minnesota, Nebraska, New Hampshire, North Carolina, Vermont, and Wisconsin.[34] Only high courts in California, Illinois, and Maine have

[32] *See* 14 COUCH ON INSURANCE § 201:13 (observing that "because any administrative procedures subject an insured to out-of-pocket expenses to correct the property damage and to execute various documentation pertaining to the loss, it would behoove the insurer to get involved in the process early on and not allow the insured to commit to the costs of extensive remediation"); 4A ENVIRONMENTAL LAW PRACTICE GUIDE, *supra* note 4, § 30.05[2][b] (advising that a request for information be used by the PRP "as an opportunity to clarify its role with respect to the site in question and, if possible, to begin establishing the basis for minimizing its future liability at the site" and that requests "should be carefully evaluated and answered, much like discovery requests during litigation").

[33] As noted, the CGL policies at issue here are standard-form policies "developed by the Insurance Services Office" and are "used throughout the United States." *Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 5 (Tex. 2007) (citation omitted).

[34] *See Travelers Cas. & Sur. Co. v. Ala. Gas Corp.*, 117 So. 3d 695, 703–708 (Ala. 2012); *Compass Ins. Co. v. City of Littleton*, 984 P.2d 606, 622 (Colo. 1999) (en banc); *R.T. Vanderbilt Co. v. Cont'l Cas. Co.*, 870 A.2d 1048, 1058–1060 (Conn. 2005); *A.Y. McDonald Indus. v. Ins. Co. of N. Am.*, 475 N.W.2d 607, 627–629 (Iowa 1991); *Aetna Cas. & Sur. Co. v. Commonwealth*, 179 S.W.3d 830, 836–838 (Ky. 2005); *Hazen Paper Co. v. U.S. Fid. & Guar. Co.*, 555 N.E.2d 576, 579–582 (Mass. 1990); *Mich. Millers Mut. Ins. Co. v. Bronson Plating Co.*, 519 N.W.2d 864, 868–870

sided with the Insurers' position, and California, the most recent of the three, did so in 1998.[35] Since then, seven state high courts have sided with insureds.[36] The results in lower courts are similarly lopsided in favor of the insureds.[37]

---

(Mich. 1994), *abrogated in part by Wilkie v. Auto-Owners Ins. Co.*, 664 N.W.2d 776 (Mich. 2003); *SCSC Corp. v. Allied Mut. Ins. Co.*, 536 N.W.2d 305, 315 (Minn. 1995) (finding duty to defend applies in administrative action by the Minnesota Pollution Control Agency), *overruled on other grounds by Bahr v. Boise Cascade Corp.*, 766 N.W.2d 910 (Minn. 2009); *Dutton–Lainson Co. v. Cont'l Ins. Co.*, 778 N.W.2d 433, 446–449 (Neb. 2010); *Coakley v. Me. Bonding & Cas. Co.*, 618 A.2d 777, 786–788 (N.H. 1992); *C.D. Spangler Constr. Co. v. Indus. Crankshaft & Eng'g Co.*, 388 S.E.2d 557, 569–570 (N.C. 1990); *State v. CNA Ins. Cos.*, 779 A.2d 662, 667 (Vt. 2001) (finding duty to defend applies in environmental cleanup action conducted by the Vermont Agency of Natural Resources); *Johnson Controls, Inc. v. Emp'rs Ins. of Wausau*, 665 N.W.2d 257, 263–264 (Wis. 2003).

[35] *Foster-Gardner, Inc. v. Nat'l Union Fire Ins. Co.*, 959 P.2d 265, 279–287 (Cal. 1998) (holding that orders from California environmental agencies do not trigger the duty to defend); *Lapham-Hickey Steel Corp. v. Prot. Mut. Ins. Co.*, 655 N.E.2d 842, 846–848 (Ill. 1995); *Patrons Oxford Mut. Ins. Co. v. Marois*, 573 A.2d 16, 20 (Me. 1990) (finding no duty to defend administrative proceedings under Maine's environmental cleanup statute).

[36] *See Travelers*, 117 So. 3d at 703–708; *Compass Ins. Co.*, 984 P.2d at 622; *R.T. Vanderbilt Co.*, 870 A.2d at 1058–1060; *Aetna Cas. & Sur. Co.*, 179 S.W.3d at 836–838; *Dutton-Lainson Co.*, 778 N.W.2d at 446–449; *CNA Ins. Cos.*, 779 A.2d at 667; *Johnson Controls*, 665 N.W.2d at 263–264.

[37] *See Travelers Indem. Co. v. Summit Corp. of Am.*, 715 N.E.2d 926, 933–934 (Ind. Ct. App. 1999); *Schnitzer Inv. Corp. v. Certain Underwriters at Lloyd's of London*, 104 P.3d 1162, 1167–1169 (Or. Ct. App. 2005) (recognizing that orders from the Oregon Department of Environmental Quality can trigger the duty to defend); *Gull Indus., Inc. v. State Farm Fire & Cas. Co.*, 326 P.3d 782, 790 (Wash. Ct. App. 2014) (concluding that state law "administrative enforcement acts" trigger the duty to defend); *see also Prof'l Rental, Inc. v. Shelby Ins. Co.*, 599 N.E.2d 423, 430–431 (Ohio Ct. App. 1991) (concluding that an administrative order from the EPA is a "suit" triggering the duty to defend, although a PRP letter is not).

Federal decisions likewise favor McGinnes's interpretation. *See, e.g.*, *Anderson Bros. v. St. Paul Fire & Marine Ins. Co.*, 729 F.3d 923, 931–935 (9th Cir. 2013) (applying Oregon law); *Land O' Lakes, Inc. v. Emp'rs Ins. Co. of Wausau*, 728 F.3d 822, 827–829 (8th Cir. 2013) (citing, *inter alia*, *SCSC Corp.*, 536 N.W.2d at 315) (applying Minnesota and Oklahoma law); *Pac. Hide & Fur Depot v. Great Am. Ins. Co.*, 23 F. Supp. 3d 1208, 1213–1218 (D. Mont. 2014) (finding duty to defend proceedings under Montana's analogue to CERCLA); *Hutchinson Oil Co. v. Federated Serv. Ins. Co.*, 851 F. Supp. 1546, 1550–1552 (D. Wyo. 1994); *Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 868 F. Supp. 1278, 1306–1311 (D. Utah 1994), *aff'd*, 52 F.3d 1522 (10th Cir. 1995); *Time Oil Co. v. Cigna Prop. & Cas. Ins. Co.*, 743 F. Supp. 1400, 1420 (W.D. Wash. 1990). *But see, e.g.*, *Ray Indus., Inc. v. Liberty Mut. Ins. Co.*, 974 F.2d 754, 758–764 (6th Cir. 1992) (interpreting Michigan law), *abrogated by Mich. Millers*, 519 N.W.2d 864; *Simon Wrecking Co. v. AIU Ins. Co.*, 350 F. Supp. 2d 624, 635–639 (E.D. Pa. 2004); *Harleysville Mut. Ins. Co. v. Sussex Cnty., Del.*, 831 F. Supp. 1111, 1130–1132 (D. Del. 1993).

"We have repeatedly stressed the importance of uniformity when identical insurance provisions will necessarily be interpreted in various jurisdictions."[38] We cannot achieve uniformity with our decision; the courts have already split. Still, "we think it prudent to strive for uniformity as much as possible."[39]

We conclude that insureds in Texas should not be deprived the coverage insureds have in thirteen other states.

\*     \*     \*     \*     \*

We answer the Fifth Circuit's certified question yes.

_____

Nathan L. Hecht
Chief Justice

Opinion delivered: June 26, 2015

---

[38] *Zurich Am. Ins. Co. v. Nokia, Inc.*, 268 S.W.3d 487, 496–497 (Tex. 2008) (internal quotation marks omitted); *see Nat'l Union Fire Ins. Co. v. CBI Indus.*, 907 S.W.2d 517, 522 (Tex. 1995) ("Courts usually strive for uniformity in construing insurance provisions, especially where, as here, the contract provisions at issue are identical across the jurisdictions.").

[39] *Trinity Universal Ins. Co. v. Cowan*, 945 S.W.2d 819, 824 (Tex. 1997).